## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MERRITT PARKWAY CONSERVANCY  :
et al.,  :
 :
       Plaintiffs,     :     NO. 3:05CV860 (MRK)
 :
v.  :
 :
NORMAN MINETA, et al.,  :
 :
       Defendants.    :

## MEMORANDUM OF DECISION
## ON MOTION TO DISMISS

     In this lawsuit, Plaintiffs Merritt Parkway Conservancy, National Trust for Historic Preservation in the United States, Connecticut Trust for Historic Preservation, Norwalk Land Trust, Norwalk River Watershed Association, Norwalk Preservation Trust, and the Sierra Club challenge the decision of the Defendants Secretary of Transportation and the Federal Highway Administration ("FHWA") to approve a highway construction project (the "Interchange Project") that was designed and will be managed by the Defendant Commissioner of the Connecticut Department of Transportation ("ConnDOT"). The Interchange Project, which is expected to be completed in two phases over the next several years, will reconstruct and substantially enlarge the interchange between U.S. Route 7, Main Avenue and the Merritt Parkway (U.S. Rt. 15) in Norwalk, Connecticut, in order to improve traffic flow and safety.  The parties agree that the construction process will affect many of the aesthetic and historic features of the Merritt Parkway, a scenic road designed and built in the 1930s that is listed in the National Register of Historic Places and has been designated a National Scenic Byway and State Scenic Road.

     FHWA approved the Interchange Project, and, in reliance on that approval, ConnDOT

awarded bids for the Project and recently began preliminary construction. In this action, commenced on May 31, 2005, Plaintiffs claim that in designing and approving the Interchange Project, Defendants failed to abide by the requirements of Section 4(f)(2) of the National Transportation Act, 49 U.S.C. § 303(c)(2) and 23 U.S.C. § 138, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C) and (E), and the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470.

Currently pending before the Court are the following motions: Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction [doc. #6]; State Defendant's Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim [doc. #38]; Plaintiffs' Motion for Summary Judgment [doc. #44]; Federal Defendant's Cross-Motion for Summary Judgment [doc. #60]; and State Defendant's Motion for Security Costs [doc. #75], in which the Federal Defendant has concurred [doc. #73]. The cross motions for summary judgment were accompanied by two sets of Local Rule 56(a) Statement of Material Facts [docs. ## 44, 53, 54, 62], and Plaintiffs and FHWA also filed briefs on Plaintiffs' request for a preliminary injunction, *see* Memorandum in Support of Motion for Preliminary Injunction [doc. #7], Memorandum in Opposition to Motion for Preliminary Injunction [doc. #24], Reply to Response to Motion for Preliminary Injunction [doc. #27]. In addition, FHWA filed an extensive administrative record, including over 300 pdf files on 4 CD-ROMs.

After a summer during which ConnDOT voluntarily abstained from pursuing certain construction work of particular concern to Plaintiffs – thereby giving the parties time to prepare briefs, compile the administrative record, and, as the Court forlornly hoped, negotiate a resolution that would avoid judicial intervention – the Commissioner announced that construction must and

would recommence on October 3, 2005. Accordingly, on September 27, 2005, the Court heard eight hours of oral argument and testimony on the Commissioner's motion to dismiss on the basis of sovereign immunity, Plaintiffs' and FHWA's cross-motions for summary judgment, and Plaintiffs' motion for preliminary injunctive relief. At the Court's request, the Commissioner participated in the proceedings on the cross-motions for summary judgment and motion for a preliminary injunction, pursuant to an agreement with Plaintiffs that they would not claim that the Commissioner's participation was a waiver of sovereign immunity.

During oral argument on the motions for summary judgment, FHWA conceded that there were a number of "serious gaps" in the administrative record. Although FHWA had previously insisted that the Court had to limit its review to the administrative record before it, and could not hear oral testimony from Plaintiffs' experts,[1] FHWA for the first time at oral argument indicated that it would like the opportunity to provide supplementary materials, either by documents or oral testimony. The parties agreed that further briefing would be necessary to determine the propriety of supplementing the administrative record in the manner FHWA proposed. Accordingly, and at the request of FHWA, the Court set a new deadline of November 29 for further briefing on the cross-motions for summary judgment, including on the question whether and how FHWA might be permitted to supplement the administrative record. However, in view of the Commissioner's representation at oral argument that ConnDOT intended to resume full construction as of October 3, the parties agreed that the Court should proceed promptly to decide Plaintiffs' preliminary

---

[1] In its brief in support of summary judgment, the FHWA stated: "[T]he scope of review is limited to the administrative record before the agency when it made its decision." Federal Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross Motion for Summary Judgment [doc. # 58] at 12.

injunction motion on the basis of the administrative record before it, with consideration of oral testimony strictly limited to the issue of irreparable harm. At the Court's request at the close of oral argument, the Commissioner generously agreed to delay resumption of full construction until October 10, 2005, in order to allow a few days for supplemental briefing by the parties and to give the Court time to prepare a full opinion on the questions of the Commissioner's motion to dismiss and Plaintiffs' request for preliminary injunctive relief.  The Court assured the parties that it would issue its ruling on those motions by the close of business on October 7, 2005.

On October 4, 2005, three days before the Court was due to issue its ruling on the State's Motion to Dismiss for Lack of Jurisdiction [doc. #38], Plaintiffs' Motion for a Preliminary Injunction [doc. #6], and State Defendant's Motion for Security Costs [doc. #75], counsel for the Commissioner informed the Court that it had discovered documents in the files of ConnDOT that the Commissioner believed bore critically on the issue of injunctive relief and ought to have been included in the administrative record. In a telephone conference with all parties, the Court explained that it would continue with the original agreed upon plan to issue an opinion on injunctive relief unless the parties submitted a written agreement requesting the Court to postpone decision on injunctive relief and proposing an alternative schedule, including arrangements for briefing the propriety of supplementing the administrative record. At 7:30 p.m. on October 6, the night before the Court had promised to issue its opinion, the parties informed the Court that they had reached such an agreement.  Accordingly, the parties requested that the Court refrain from issuing a ruling on injunctive relief on October 7, as previously planned, though they asked the Court to rule on the Commissioner's motion to dismiss, albeit in due course rather than by October 7.

On October 7, 2005, the parties filed a Second Supplemental Joint Proposed Scheduling

4

order [doc. #80], which asked the Court to postpone indefinitely its ruling on Plaintiffs' Motion for

a Preliminary Injunction. In the agreement with Plaintiffs, the Commissioner undertook to extend

ConnDOT's moratorium on construction activity, with certain limited and enumerated exceptions

that were detailed in correspondence between the parties and agreed to by Plaintiffs, though the

Commissioner reserved the right to reconsider his position on the moratorium if the Court had not

resolved the parties' pending motions by  January 2, 2006.   In accordance with the parties'

agreement, this opinion addresses only the State Defendant's Motion to Dismiss [doc. #38] and omits

the extensive discussion of the case's factual background developed by the Court after exhaustive

review of the administrative record in connection with the motion for injunctive relief.

## I.

The Commissioner has moved to dismiss this action as to him under Rules 12(b)(1) and

12(b)(6) of the *Federal Rules of Civil Procedure.  See* State Defendant's Motion to Dismiss [doc.

# 38]. On a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6) of the *Federal Rules of*

*Civil Procedure*, the Court "must accept as true all material factual allegations in the complaint,"

*J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004).   "A complaint should

not be dismissed . . . 'unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief.' "  *Todd v. Exxon Corp.*, 275 F.3d 191, 197-98

(2d Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).   Thus, "[t]he issue is not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

## II.

The following facts are taken from the First Amended Complaint [doc. # 26] and are

accepted as true for purposes of the pending motion to dismiss. The current controversy arises from ConnDOT's plans to improve traffic flow and safety by reconstructing the interchange between the Merritt Parkway and Main Avenue in Norwalk, and by creating in the same area a large interchange providing full access from all directions between the Merritt Parkway and U.S. Route 7. The Interchange Project has a lengthy history dating back over thirty years, to a time when the Merritt Parkway was not listed on the National Register of Historic Places (that did not occur until 1991) and when design plans for changes in the parkway were not subject to review for compliance with Section 4(f) or the comprehensive planning, maintenance and landscaping specifications for the Merritt Parkway developed by ConnDOT in the early 1990s, namely the Merritt Parkway Landscape Master Plan, Merritt Parkway Guidelines for General Maintenance and Transportation Improvements, Merritt Parkway Conservation and Restoration Plan: Bridge Restoration Guide (collectively "Merritt Parkway Guidelines").

The Interchange Project began as a sub-component of a larger plan in the 1950s to construct a slightly relocated and much wider U.S. Route 7 from I-95 in Norwalk, north to I-84 in Danbury. This was known as the "Super 7 Project." The Super 7 Project ran into difficulties and in the 1970s ConnDOT reduced the scope of that project to focus solely on improvements in Norwalk and Danbury. At the Norwalk end, the downsized Super 7 plans led to construction of a short extension of the freeway between I-95 and Grist Mill Road in Norwalk, with only a partial interchange permitting movement between Route 7 and the Merritt Parkway to or from the west. Access between the Merritt Parkway and Route 7 to and from the east was, and is, accomplished via the Merritt Parkway / Main Avenue interchange located 500 meters to the east of the Route 7 / Merritt Parkway interchange.

6

Funding and other constraints continued to prevent realization of the full Super 7 Project, but by 1993 ConnDOT had decided to pursue two components of the Project: extending Route 7 as far as Route 33 in Wilton (the "Freeway Extension"); and reconstructing the Route 7 / Merritt Parkway interchange to provide a fully directional exchange – that is, access from the east as well as the west (the "Interchange Project").

The years 1998 to 2001 saw a flurry of activity related to securing federal funding for ConnDOT's Interchange and Freeway Exchange projects, including joint preparation and publication by ConnDOT and FHWA of the following documents relating to the projects: draft and final federal environmental assessments; Section 4(f) evaluations; and the documentation required by Section 106 of the National Historic Preservation Act.  In addition both ConnDOT and FHWA negotiated with statutory oversight bodies such as the United States Department of Interior (DOI) and the State Historic Preservation Officer, and ultimately executed a Memorandum of Understanding (MOA) between FHWA and the State Historic Preservation Officer, with ConnDOT's concurrence. Among other things, the MOA committed ConnDOT and FHWA to ensure that the final designs for the Interchange Project were consistent to the extent feasible with ConnDOT's Merritt Parkway Guidelines  and that a body created by ConnDOT to monitor compliance with those Guidelines – the Merritt Parkway  Parkway Advisory Committee ("MPAC") – reviewed and commented on the final designs.

On December 15, 2000, FHWA issued a Final Environmental Assessment/Section 4(f) Evaluation (the "Final EA") for the Interchange Project.  The Final EA acknowledged ConnDOT's decision not to move forward with the Freeway Extension Project for the foreseeable future.  Instead, ConnDOT would proceed with a "Widening Alternative," which would widen existing Route 7

7

between Grist Mill Road and Route 33, and with the Interchange Project. The Final EA acknowledged that the Interchange Project would affect many aesthetic and historical features of the Merritt Parkway as well as the Glover Street Bridge, another federally protected historic resource. The Final EA did not consider alternative designs to minimize harm to these historic resources. Instead, the Final EA stated that to minimize harm to historic sites, as required by Section 4(f), modifications to the Merritt Parkway would be evaluated for consistency with the Merritt Parkway Guidelines and that ConnDOT would continue to coordinate with MPAC as stipulated in the parties' MOA.

At a  meeting of  MPAC on March 15, 2000, ConnDOT's representative informed MPAC that the ramps for the Interchange Project would be located below the grade of the Merritt Parkway to minimize the visual impact.   In 2001 and 2002, partially-completed design plans for the Interchange Project were submitted to MPAC for their review and comments.  However, as alleged in the Amended Complaint, ConnDOT did not submit the final design plans for the Interchange Project to MPAC for its review and comment prior to awarding a contract for the construction of the roadway.

In October 2004, after ConnDOT had put the Interchange Project out to bid, the Merritt Parkway Conservancy, a member of MPAC and a plaintiff in this suit, purchased a copy of the final plans for the Interchange Project on file with ConnDOT, and discovered for the first time that ConnDOT's final design called for the demolition of the Main Avenue Bridge, an historic stone bridge on the Merritt Parkway,  and for elevation of the ramps for the Interchange Project up to 36 feet above the grade of the Merritt Parkway.   Neither of these aspects of the final design had ever been disclosed before.  In addition, according to Plaintiffs, the Interchange Project will require

8

significant alterations to additional historic bridges and the destruction of nearly a mile of mature landscaping along the Parkway that contributes to the Parkway's historic significance.

On or about April 7, 2005, FHWA gave ConnDOT final approval to award a construction contract for the first phase of the Interchange Project; phase two of the project is not scheduled to begin until 2008.  Construction on phase one began in or about May, and this suit followed shortly thereafter.  Plaintiffs claim that FHWA and ConnDOT have "worked in partnership" on the Interchange Project," which they characterize as "a joint state and federal project," Amended Complaint [doc. #26] at ¶ 17, and that construction of the Project violates various provisions of the National Transportation Act, the National Environmental Policy Act, and the National Historic Preservation Act ("NHPA").  Count I alleges that the FHWA's approval of the Interchange Project was arbitrary and capricious and contrary to the requirements of Section 4(f).  Count II and III claim that the determination that the Interchange Project would not have a significant impact on the environment was arbitrary and capricious and contrary to NEPA.  Finally, Count IV asserts that the failure to consider alternative designs to reduce or minimize harm to the Merritt Parkway and other historic and natural resources violated NHPA and the MOA executed between FHWA, the State Historic Preservation Officer and ConnDOT.  Each count alleges that Plaintiffs will be irreparably harmed unless the Court enjoins Defendants from proceeding with all activities in connection with the Interchange Project and until such time as the alleged violations of the federal statutes and the MOA are cured.

### III.

The Commissioner moves to dismiss this action as to him principally on the basis of the Eleventh Amendment.  *See* State Defendant's Motion to Dismiss [doc. # 38].  The Eleventh

9

Amendment provides in relevant part that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States."  U.S. Const. Amend. XI.   Under the Eleventh Amendment, as construed by the Supreme Court, federal courts lack jurisdiction to entertain suits against non-consenting states.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996).  And this is true whether the plaintiff chooses to sue the state itself or, as here, a state official in his official capacity.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Edelman v. Jordan*, 415 U.S. 651, 677 (1974).

As with most rules, however, there are exceptions even to the substantial jurisdictional bar erected by the Eleventh Amendment.  In certain circumstances, Congress can abrogate states' Eleventh Amendment immunity.  *See Seminole Tribe*, 517 U.S. at 55-56; *Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367, 371 (2d Cir. 2005).   Also, states may expressly waive their immunity and agree to being sued in federal court.  *See Edelman*, 415 U.S. at 673.  Plaintiffs do not press either of these exceptions.  Instead, Plaintiffs rely on an exception created by the Supreme Court nearly a century ago in the landmark case of *Ex Parte Young*, 209 U.S. 123 (1908).

Under the *Ex Parte Young* doctrine, even absent an explicit waiver or abrogation of a state's Eleventh Amendment immunity, a plaintiff can sue in federal court to obtain prospective injunctive relief against a state official who the plaintiff alleges is violating or threatening to violate the United States Constitution or a federal statute. *See Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002) ("Even absent waiver, Verizon may proceed against the individual commissioners in their official capacities pursuant to the doctrine of *Ex Parte Young*."); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 276-77 (1997) ("Our precedents do teach us . . . that where prospective relief is sought against individual state officers in a federal forum based

10

on a federal right, the Eleventh Amendment, in most cases, is not a bar.") A unanimous Supreme Court recently reiterated that "[i]n determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon*, 535 U.S. at 645 (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring in part)).

Here, the Commissioner concedes, as he must, that Plaintiffs' Amended Complaint [doc. #26] seeks prospective injunctive relief.[2]  Instead, the Commissioner argues that the *Ex Parte Young* doctrine does not apply because Plaintiffs have not identified any federal constitutional or statutory provisions that the Commissioner is threatening to violate. *See* Memorandum of Law in Support of the Defendant Commissioner of the Connecticut Department of Transportation's Motion to Dismiss [doc. # 39] at 16.  According to the Commissioner, the Amended Complaint is directed to FWHA and the Commissioner is not alleged to have violated any federal law himself.  Moreover, the Commissioner argues, FHWA is the only entity that is required to comply with Section 4(f), NEPA and the NHPA; the Commissioner, therefore, cannot be violating, and cannot remedy any violations of, these federal laws.  *Id.* at 16-19.  The Court is not persuaded.

As an initial matter, it important to note that the case books are full of court decisions involving Section 4(f) and NEPA in which a state highway commissioner is a named defendant and in which courts have considered or even granted injunctive relief. *See, e.g.*, *Preservation Coalition*

---

[2]  The Amended Complaint also seeks a declaratory judgment.  However, as in *Verizon*, "no past liability of the State, or of any of its commissioners, is at issue. It does not impose *upon the State* 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.' Insofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction." *Verizon*, 535 U.S. at 646 (quoting *Edelman*, 415 U.S. at 668)).

*of Erie County v. Federal Transit Administration*, 356 F.3d 444 (2d Cir. 2004); *Stewart Park & Reserve Coalition, Inc. (SPARC) v. Slater*, 352 F.3d 545 (2d Cir. 2003); *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002); *Southwest Williamson County Community Ass'n v. Slater*, 243 F.3d 270 (6th Cir. 2001); *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686 (3d Cir. 1999); *Corridor H Alternatives, Inc., v. Slater*, 166 F.3d 368 (D.C. Cir. 1999); *Senville v. Peters*, 327 F. Supp. 2d 335 (D.Vt. 2004); *Friends of Pioneer Street Bridge Corp. v. Federal Highway Administration*, 150 F. Supp. 2d 637 (D.Vt. 2001). It is true that some cases involving both state and federal highway authorities were decided before the Supreme Court refined its Eleventh Amendment jurisprudence in *Seminole Tribe*.[3] However, there are also numerous cases in the post-*Seminole Tribe* era (for example, all of the cases cited above), and not one of the courts involved in those cases ever suggested that the state official was an improper party. The Commissioner theorizes that in each of those cases the state highway commissioner voluntarily agreed to submit to the federal court's jurisdiction. Yet, the Commissioner candidly acknowledges that he has no support for his supposition. Moreover, the Commissioner also concedes that despite diligent research, he is unaware of a single decision anywhere in the country that has dismissed a state highway commissioner from a Section 4(f) or NEPA lawsuit on Eleventh Amendment grounds.

In theory, of course, it is certainly possible that all of the above-mentioned courts, including the Second Circuit, simply missed what is to the Commissioner a perfectly apparent Eleventh

---

[3] In *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974), the Second Circuit held that non-federal parties may be enjoined pending completion of an environmental impact statement. However, the expressly stated rationale for *Biderman* was waiver, an argument that is not made by Plaintiffs, perhaps because such an argument would be suspect in light of the Supreme Court's decisions in *Edelman* and its progeny.

Amendment issue that would have deprived the courts of subject matter jurisdiction.   However, the Court believes that there is another reason why the Commissioner has come up short in his search case law supportive of his Eleventh Amendment claim.   Simply put, his argument is unpersuasive, and this case demonstrates why.

As *Verizon* emphasizes, at this stage, to determine whether the *Ex Parte Young* doctrine applies, a district court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law." *Verizon*, 535 U.S. at 645. Furthermore, that inquiry "does not include an analysis of the merits of the claim." *Id.* at 646; *see Coeur d'Alene*, 521 U.S. at 281 ("An *allegation* of an ongoing violation of federal law . . . is ordinarily sufficient to invoke the *Young* fiction.") (emphasis added).   Here, Plaintiffs' Amended Complaint alleges an ongoing violation of several federal laws.  *See, e.g.*, Amended Complaint [doc. # 26] at ¶¶ 43, 56, 63.   Those laws, by their express terms, may apply to FHWA of federal agenceis.   However, the Amended Complaint also alleges that FHWA and the Commissioner have entered into a "partnership" to design and complete the Interchange Project.  *Id.* ¶ 17 (Defendant Korta "has worked in partnership with the FHWA in developing the Environmental Assessment / Section 4(f) Evaluation for the project as a joint state and federal project.").   Therefore, as alleged, the Commissioner and FHWA are acting in concert to design and construct a federal highway project in violation of Section 4(f), NEPA and the NHPA. Indeed, in its Memorandum of Law in Support of Motion to Dismiss for Failure to Join an Indispensable Party, or in the Alternative, for Joinder [doc. # 23] at 7-8, FHWA describes the State's role in the Interchange Project as follows:

> There can be no dispute that the ConnDOT designed the Interchange Project, that the ConnDOT implemented the project, that the ConnDOT hired contractors for the project, and that it is the ConnDOT and its contractors, *not* the federal defendants,

who are engaging in construction and demolition on the project. And, as noted above, the environmental documents which are the subject of this lawsuit, while prepared under the direction of the FHWA, were in fact prepared and developed by the ConnDOT.

Of course, whether Plaintiffs can prevail on the allegations of their Amended Complaint is not an issue at this stage. It suffices that the Amended Complaint makes allegations of ongoing violations of federal law in which both FHWA and the Commissioner, as partners, are participating. *See Verizon*, 535 U.S. at 646. As the Second Circuit held recently, "Under *Ex Parte Young*, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law. So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act." *Dairy Mart*, 411 F.3d at 372-73. That connection has been adequately pled in this case given the fact that the Amended Complaint asserts that FHWA and the Commissioner are in a "partnership" to construct the Interchange Project in violation of federal law and the MOA – to which the Commissioner is a signatory and which Plaintiffs allege is binding on the State not merely as matter of contract law, but under the National Historic Preservation Act as well. *See* Amended Complaint ¶¶ 70, 72.

Commissioner Korta makes much of the Second Circuit's decisions in *Preservation Coalition of Erie County*, 356 F.3d at 455, and *W. Mohegan Tribe & Nation of New York v. New York*, 246 F.3d 230, 232 (2d Cir. 2001), which stated that non-federal agencies are not liable for violations of the NHPA. However, the Court is not persuaded that either decision requires a different result in this case. First, the Court notes that even though state officials were parties to those actions, neither the district courts nor the Second Circuit ever suggested that the Eleventh Amendment deprived the federal courts of subject matter jurisdiction over the state defendants.

14

Second, this case involves allegations of violations of Section 4(f), NEPA and the MOA, in addition to NHPA.  Finally, and importantly, whether the Commissioner can be held liable for violating NHPA is a fundamentally different question than whether this Court has subject matter jurisdiction to enjoin the Commissioner from proceeding with construction of a project that is alleged to violate the NHPA.

Because Plaintiffs are seeking prospective relief only and are alleging ongoing violations of federal law by both FHWA and the Commissioner, the Eleventh Amendment is no bar to Plaintiffs' claims against the Commissioner.  *See Davis*, 302 F.3d at 1110 n.2 ("Where NEPA is implicated by a highway project in which state agencies are participating, the state agencies are also proper parties and we have the authority to instruct the district court to enjoin the state agencies from further construction on the highway project."); *Southwest Williamson County Community Assoc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001) ("If we conclude that the highway corridor constitutes a 'major federal action,' then we have the authority to instruct the district court to enjoin the state from further construction on the highway."); *Joseph v. Adams*, 467 F. Supp. 141, 148 (E.D. Mich. 1978) ("[P]laintiffs are seeking enjoin state officials from continuing with the Dort Highway project until an EIS has been filed and the required hearings have been held.  This prospective equitable relief does not trigger the Eleventh Amendment.") (relying on *Ex Parte Young*).[4]

---

[4]  In a related vein, the Commissioner also moved to dismiss the Amended Complaint [doc. #26] under Rule 12(b)(6) of the *Federal Rules of Civil Procedure* on the ground that it failed to state a claim upon which relief can be granted against because it does not allege any constitutional or statutory violation by the Commissioner.  For the same reasons as the Court rejects the Commissioner's *Ex Parte Young* argument, the Court also rejects the Commissioner's Rule 12(b)(6) motion.  For present purposes, the Amended Complaint adequately alleges conduct on the part of the Commissioner, which if permitted to continue, would constitute a violation of federal law, and the Commissioner is a proper party to the suit.  *See* cases cited in textual discussion directly preceding this footnote.

One further point deserves mention.  In his opinion announcing the judgment for a divided court in *Coeur d'Alene*, Justice Anthony Kennedy suggested that in addition to the specific requirements of *Ex Parte Young* mentioned above, courts determining the applicability of the Eleventh Amendment should consider the "real affront to a State of allowing a suit to proceed" in federal court.  *Coeur d'Alene*, 521 U.S. at 277.   Picking up on that language, the  Commissioner argues that retaining him in this litigation for purposes of prospective injunctive relief does, in fact, constitute an affront to the State of Connecticut's dignity.

The Court respectfully disagrees. It can hardly be considered an affront to the dignity of the State of Connecticut to ask its Commissioner of Transportation to defend in federal court a project: (1) that the State designed and wishes to construct using substantial federal funds; (2) that required the approval of a federal agency (FHWA); (3) that affects two federal highways (U.S. Rt. 7 and the Merritt Parkway, U.S. Rt. 15)  and federally protected historic resources; and (4) that is expressly governed by several provisions of federal law – Section 4(f), NEPA and the NHPA – all of which a court must construe in order to resolve the parties' dispute.  Perhaps that is why the state highway commissioners involved in each of the federal highway  cases previously cited never sought to extricate themselves from federal litigation that could determine the fate of their important state projects.  Instead, to their credit, they remained in the lawsuits and sought to defend their projects as consistent with the federal laws that governed them.

Accordingly, the Court DENIES the Commissioner's Motion to Dismiss [doc. # 38].

**IV.**

For the foregoing reasons, the Court DENIES the Commissioner's Motion to Dismiss [doc. #38].

16

IT IS SO ORDERED.


/s/        Mark R. Kravitz     
United States District Judge


**Dated at New Haven, Connecticut: <u>October 14, 2005</u>.**