UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MERRITT PARKWAY CONSERVANCY  :
et al.,                                              :
                              Plaintiffs,           :          NO. 3:05CV860 (MRK)
                                                     :
v.                                                   :
                                                     :
NORMAN MINETA, et al.,                    :
                              Defendants.          :

## MEMORANDUM OF DECISION

In this lawsuit, Plaintiffs Merritt Parkway Conservancy, National Trust for Historic Preservation in the United States, Connecticut Trust for Historic Preservation, Norwalk Land Trust, Norwalk River Watershed Association, Norwalk Preservation Trust, and the Sierra Club challenge the decision of Defendants Secretary of Transportation and the Federal Highway Administration ("FHWA") to approve a highway construction project (the "Interchange Project") that was designed and will be managed by Defendant Commissioner of the Connecticut Department of Transportation ("ConnDOT"). The Interchange Project, which is expected to be completed in two phases over the next several years, will reconstruct and substantially enlarge the interchange between U.S. Route 7, Main Avenue, and the Merritt Parkway (U.S. Rt. 15) in Norwalk, Connecticut.

The Merritt Parkway is a scenic road familiar to all citizens of Connecticut. The Parkway, which was designed and built in the 1930s, is listed in the National Register of Historic Places and has been designated a National Scenic Byway and State Scenic Road. According to a ConnDOT Policy Statement issued by then-Commissioner Emil F. Frankel in June 1994:

> The Merritt Parkway is a distinct type of roadway having an important aesthetic value, in addition to its vital transportation function. It is the Department's responsibility to maintain this crucial transportation artery as a safe and efficient roadway while also preserving and enhancing it as an important State scenic, cultural and historic resource.

It is clear that the Interchange Project, as currently designed, will have a significant impact on many of the aesthetic and historic features of the Merritt Parkway, including its historic bridges, ramps, ornamental parapets, and piers, as well as its park-like landscape and vistas. But it is equally clear that changes to the Merritt Parkway / Rt. 7 interchange to make it fully directional and to ease the significant traffic congestion in the Main Avenue area are needed. The difficulty is in reconciling the public interest in safety and convenience with the public interest in preservation of an important historic resource.

Congress undoubtedly thought it had provided an answer to this recurrent problem when it enacted Section 4(f) of the Department of Transportation Act, originally codified at 49 U.S.C. § 1653(f) (1966), recodified at 49 U.S.C. § 303 (1983), and reproduced at 23 U.S.C. § 138 (1966). Section 4(f) "declare[s it] to be the national policy that special effort should be made to preserve the natural beauty" of certain protected resources, such as "the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 23 U.S.C. § 138 (a). To that end, Section 4(f) states that the Secretary of Transportation "shall not approve any program or project . . . which requires use [of a protected resource] . . . unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such [protected resource]." *Id*.

In enacting Section 4(f), Congress required FHWA to engage in planning and substantive analysis before FHWA approves a project so as to lessen the likelihood of disruption once a project is approved. Plaintiffs maintain that FHWA has failed to comply with this congressional mandate and, despite repeated encouragement from the Court, the parties have been unwilling or unable to reach a negotiated settlement of their differences. The Court is therefore confronted with a truly

2

regrettable situation. The Interchange Project has already been approved by FHWA and, in reliance on that approval, ConnDOT has awarded costly bids for the project and has even begun preliminary construction.  If the Interchange Project proceeds, Plaintiffs assert that irreparable harm to historic and natural resources will occur; if it does not proceed, taxpayers will foot the bill for increased costs in completing a highway project that is undoubtedly long overdue and important to the State of Connecticut. Either way, the citizenry is disserved.  Moreover, as a result of the parties' intransigence, this Court is required to intervene in a complex dispute involving the public interest in an area in which the Court has absolutely no expertise or training – exactly the sort of matter that should be resolved by public officials and those whom they are charged with representing.  Of course, the Court cannot know, and certainly should not decide, whether the current design for the Interchange Project is wise or unwise. That is for the public officials to determine consistent with the requirements of law. The Court's role is properly limited to assuring itself and the public, by means of what the Supreme Court has termed a "thorough, probing, in-depth review" of the administrative record, *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), that the Interchange Project was designed and approved by FHWA in accordance with Congress's substantive instruction that the FHWA engage in "all possible planning to minimize harm" to the Merritt Parkway.

Unfortunately, the administrative record, which this Court has reviewed in depth, does not adequately demonstrate that FHWA satisfied the requirements of Section 4(f)(2). The Court emphasizes that this conclusion does not mean that the current Interchange Project design fails to minimize harm to the Merritt Parkway.  All it means is that the administrative record before this Court does not demonstrate that FHWA made such a finding or upon what reasoned basis it did so.

3

With commendable candor, FHWA conceded as much at a hearing on Plaintiffs' request for preliminary injunction. But FHWA is not the only party at fault in this case.  For their part, Plaintiffs appear to have been asleep at the switch as the designs for the Interchange Project made their way through the approval process in 2000 and 2001.  Had Plaintiffs pressed their objections sooner, it is possible that disruption of the Interchange Project might have been avoided. ConnDOT is not blameless either. It has been well aware of Plaintiffs' concerns since at least 2004. Yet according to the Deputy Commissioner for Operations, Mr. Carl Bard, ConnDOT consciously chose to proceed without making changes to the Interchange Project, knowing full well that litigation would likely ensue and that the project might be delayed as a result. As Deputy Commissioner Bard explained, litigation was a risk that ConnDOT knowingly assumed when it proceeded with the Interchange Project despite Plaintiffs' concerns.

Because the administrative record is inadequate to show that FHWA satisfied the stringent substantive mandate of Section 4(f), the Court concludes that the matter must be remanded to FHWA to cure the defects in its compliance with Section 4(f). The Court acknowledges that the public will not be well served by a substantial delay of the Interchange Project, regardless of the reason. However, the Court notes that the parties have it in their power to reduce the inconvenience to the public by expediting whatever further proceedings are necessary to achieve compliance with Section 4(f). In view of the voluntary moratorium of construction activity that has been and, at this time, remains in place, the Court will defer entry of an order on injunctive relief for one week, pending input from the parties on whether continuation of the voluntary moratorium is possible (which is the Court's preference), or if not, the appropriate scope and duration of carefully tailored injunctive relief.

# I.    Procedural History

In this action, commenced on May 31, 2005, Plaintiffs claim that in designing and approving the Interchange Project, Defendants failed to abide by the requirements of Section 4(f)(2) of the Department of Transportation Act, 49 U.S.C. § 303, as well as the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C) and (E), and the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470.   Specifically, Count I alleges that the FHWA's approval of the Interchange Project was arbitrary and capricious and contrary to the requirements of Section 4(f). Counts II and III claim that the determination that the Interchange Project would not have a significant impact on the environment was arbitrary and capricious and contrary to NEPA.   Finally, Count IV asserts that the failure to consider alternative designs to reduce or minimize harm to the Merritt Parkway and other historic and natural resources violated NHPA and a Memorandum of Agreement ("MOA") executed between FHWA, the State Historic Preservation Officer, and ConnDOT.

Each count alleges that Plaintiffs will be irreparably harmed unless the Court enjoins Defendants from proceeding with the Interchange Project until such time as FHWA cures the alleged violations of the federal statutes and the MOA. Accordingly, on June 20, 2005, Plaintiffs filed a Motion for a Temporary Restraining Order and a Preliminary Injunction [doc. #6]. The Court immediately convened an on-the-record  telephonic status conference with all the parties to clarify the imminence of the alleged irreparable harm and to exhort the parties to work on a solution that would avoid judicial intervention. After receiving assurances from the Connecticut Attorney General's office that the work of particular concern to Plaintiffs would not continue or commence in the near future, the Court set the matter down for hearing on August 1, 2005.

On July 8, 2005,  FHWA filed a Motion to Dismiss for Failure to Join an Indispensable Party [doc. #22], namely, the Connecticut Department of Transportation.  Plaintiffs responded by filing an Amended Complaint [doc. #26] naming the Commissioner of ConnDOT as co-Defendant. Accordingly, the Court denied the FHWA's Motion to Dismiss [doc. #22] without prejudice to renewal. Thereafter,  the Commissioner moved to dismiss the action as to him principally on Eleventh Amendment grounds [doc. # 38].

During further telephonic conferencing during the summer, the parties jointly asked the Court to postpone the hearing on injunctive relief, and ConnDOT generously agreed to defer certain (though not all) construction activities in order to give all parties adequate time to assemble the record. However, ConnDOT made it clear that it intended to resume full construction, which would include demolition of the Main Avenue Bridge, on October 3, 2005. The Court therefore set a hearing on all outstanding motions for September 27, 2005.

In August and September, the parties extensively briefed the following motions: State Defendant's Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim [doc. #38]; Plaintiffs' Motion for Summary Judgment [doc. #44]; and Federal Defendant's Cross-Motion for Summary Judgment [doc. #60]. The cross motions for summary judgment were accompanied by two sets of Local Rule 56(a) Statements of Material Facts [docs. ## 44, 53, 54, 62]. In addition, FHWA filed an extensive administrative record, including over 300 pdf files on 4 CD-ROMs, which the Court carefully reviewed in preparation for oral argument. Plaintiffs and FHWA also filed briefs on Plaintiffs' request for a preliminary injunction. *See* Memorandum in Support of Motion for Preliminary Injunction [doc. #7]; Memorandum in Opposition to Motion for Preliminary Injunction [doc. #24]; Reply to Response to Motion for Preliminary Injunction [doc. #27].

On September 27, 2005, the Court heard eight hours of oral argument on sovereign immunity, the cross-motions for summary judgment, and injunctive relief. The Court also heard testimony from witnesses and received evidence relating to the issue of irreparable harm. Counsel for the Commissioner conditioned the State's participation at the argument and hearing on an undertaking by Plaintiffs not to interpret such participation as a waiver of sovereign immunity. Plaintiffs agreed.

During oral argument on the motions for summary judgment, FHWA conceded that there were a number of "serious gaps" in the administrative record regarding its compliance with Section 4(f) and indicated that it would like the opportunity to fill these gaps by supplementing the administrative record with documents and/or oral testimony. The parties agreed that further briefing would be necessary to determine the propriety of supplementing the administrative record in this manner. Accordingly, and at the request of FHWA, the Court set a new deadline of November 29 for full briefing on the cross-motions for summary judgment. However, in view of the Commissioner's representation at oral argument that ConnDOT intended to resume full construction as of October 3, the parties agreed that the Court should proceed promptly to decide Plaintiffs' preliminary injunction motion on the basis of the administrative record before it, with consideration of oral testimony strictly limited to the issue of irreparable harm. At the Court's request at the close of oral argument, the Commissioner once again generously agreed to delay resumption of full construction until October 10, 2005, in order to allow a few days for supplemental briefing by the parties and to give the Court time to prepare a full opinion on the questions of the Commissioner's motion to dismiss and Plaintiffs' request for preliminary injunctive relief. The Court assured the parties that it would issue its ruling on those motions by the close of business on October 7, 2005.

On October 4, 2005, three days before the Court was due to issue its ruling on the State's Motion to Dismiss for Lack of Jurisdiction [doc. #38], Plaintiffs' Motion for a Preliminary Injunction [doc. #6], and State Defendant's Motion for Security Costs [doc. #75], counsel for the Commissioner informed the Court that ConnDOT had discovered in its files documents properly belonging to, but inadvertently omitted from, the administrative record that had been filed with the Court. In a telephone conference with all parties, the Court explained that it would continue with the originally agreed plan to issue an opinion on injunctive relief unless the parties submitted a written agreement asking the Court to postpone its decision on injunctive relief and proposing an alternative schedule, including arrangements for briefing the propriety of supplementing the administrative record. At 7:30 p.m. on October 6, the night before the Court had promised to issue its opinion, the parties informed the Court that they had reached such an agreement.  Accordingly, the parties asked  the Court to refrain from issuing a ruling on injunctive relief on October 7, as previously planned, and to proceed, in due course, to rule on the Commissioner's Motion to Dismiss.

On October 7, 2005, the parties filed a Second Supplemental Joint Proposed Scheduling Order [doc. #80], which asked the Court indefinitely to postpone its ruling on Plaintiffs' Motion for a Preliminary Injunction. In the agreement with Plaintiffs, the Commissioner undertook to extend ConnDOT's moratorium on construction activity, with certain limited and enumerated exceptions that were detailed in correspondence between the parties and agreed to by Plaintiffs. The Commissioner reserved the right to reconsider his position on the moratorium if the Court had not resolved the parties' pending motions by January 2, 2006.  In accordance with the parties' agreement, and pending full briefing as to what should constitute the administrative record upon which the Court should base its decision as to injunctive relief and summary judgment, the Court proceeded to rule

8

only on the Commissioner's Motion to Dismiss for Lack of Jurisdiction [doc. #38]. The Court denied the Commissioner's motion on October 14, 2005 [doc. #82]. The Court notes that had Defendants spent the last six months, while the voluntary moratorium was in place, remedying the defects alleged by Plaintiffs rather than filing additional legal briefs, further delay of the Interchange Project could have been avoided.

In any event, the parties' submissions on the scope of the record and in response to each other's motions for summary judgment were completed on January 5, 2006, when ConnDOT filed its Reply to Plaintiffs' Opposition to Summary Judgment [doc. #103]. Because the parties themselves had delayed briefing on these issues and because major construction work would not in any event occur during the winter months, the Commissioner informed the Court that ConnDOT would continue to comply with the voluntary moratorium, though it hoped to begin full construction in early April. As a consequence, the parties informed the Court that they considered the preliminary injunction motion moot and that the Court should proceed to decide the summary judgment motions on the basis of whatever the Court concluded constituted the full administrative record. While the Court continued to review the parties' voluminous submissions, the Court *sua sponte* on February 21, 2006, ordered the parties to appear before United States Magistrate Judge William I. Garfinkel for the purpose of holding good-faith discussions regarding a negotiated resolution of this case. The Court continued to hope that the parties themselves could bring their considerable expertise to bear to solve this dispute. A settlement conference was held on March 22, 2006. Much to the Court's regret, however, the conference did not produce a negotiated resolution.

Currently pending before the Court are the following motions: Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction [doc. #6]; Plaintiffs' Motion for Summary

Judgment [doc. #44]; Federal Defendant's Cross-Motion for Summary Judgment [doc. #60]; State Defendant's Motion for Summary Judgment [doc. #89], Defendants' Joint Motion to Supplement the Administrative Record [doc. #84], and State Defendant's Motion for Security Costs [doc. #75], in which the Federal Defendant has joined [doc. #73]. The cross motions for summary judgment were accompanied by three sets of Local Rule 56(a) Statements of Material Facts [docs. ## 44, 53, 54, 62, 89-2, 96], and Plaintiffs and FHWA also filed briefs on Plaintiffs' request for a preliminary injunction, *see* Memorandum in Support of Motion for Preliminary Injunction [doc. #7], Memorandum in Opposition to Motion for Preliminary Injunction [doc. #24], Reply to Response to Motion for Preliminary Injunction [doc. #27].

## II.   The Administrative Record

The parties agree that this Court's review of FHWA's actions is limited to the administrative record that was before the agency at the time it approved the Interchange Project. *See Overton Park*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his [Section 4(f)] decision."). Prior to argument, FHWA submitted an extensive administrative record, including over 300 pdf files on 4 CD-ROMs. After  the Court identified several troubling gaps in the administrative record at oral argument – gaps acknowledged by FHWA – Defendants  moved to supplement the record with an additional three dozen documents located in ConnDOT's files and inadvertently omitted from the initial designation of the record. *See* Defendants' Joint Motion to Supplement the Administrative Record [doc. #84] and exhibits thereto [docs. ##86-3, 86-4, 87, 88].

The record as originally designated to the Court contained both FHWA and ConnDOT documents. However, when Defendants sought to introduce further documents that had been

preserved only in ConnDOT's files (some of which it is clear FHWA reviewed and others of which may or may not have traveled from ConnDOT to FHWA), Plaintiffs objected on the ground that the administrative record may not include documents relating to the Interchange Project that were neither located in FHWA files nor otherwise proven to have passed through the hands of FHWA officials. Accordingly, Plaintiffs urged the Court to deny the motion to supplement, and to regard all ConnDOT documents not proven to have been reviewed by FHWA as extra-record materials, admissible to provide background to the Court, but not to show that FHWA complied with its statutory obligations. *Id*.

The Court declines to adopt Plaintiffs' restrictive view of the scope of the administrative record, a view that appears to be based on an over-reading of the decisional law in this area. As explained below, the Court believes that the better approach is to include all ConnDOT records relating to the joint federal-state Interchange Project as part of the administrative record before the FHWA, and to grant Defendants' Joint Motion to Supplement the Administrative Record [doc. #84].

Courts considering the appropriate scope of an administrative record must strike a balance between two often competing interests. On the one hand, inexpert courts must not engage in Monday-morning quarterbacking regarding the decisions of expert agencies – hence the rule that "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). On the other hand, courts must protect the public interest in ensuring that agencies do not ignore inconvenient information or "skew the record . . . by excluding pertinent but unfavorable information," *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005), perhaps by burying it in the files of state agencies. These interests are both satisfied by holding that "[t]he

11

complete administrative record consists of all documents and materials directly or indirectly considered by the agency," *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (emphasis added), and that "a document need not literally pass before the eyes of the final agency decisionmaker to be considered part of the administrative record." *Clairton Sportsmen's Club v. Pennsylvania Turnpike Commission*, 882 F. Supp. 455, 465 (W.D. Pa. 1995). Applying this approach to the lengthy collaboration between FHWA and ConnDOT on the Interchange Project, the Court concludes that  all ConnDOT records relating to the joint federal-state Interchange Project should be considered part of the administrative record before the FHWA.

Unfortunately, it appears that a number of pertinent documents in ConnDOT's custody were omitted from the record as originally submitted to the Court, and Defendants have requested that they be allowed to supplement the record to make good this oversight. *See* Defendants' Joint Motion to Supplement the Administrative Record [doc. #84]. To be clear, FHWA and ConnDOT seek only to add documents created contemporaneously with the development of the Interchange Project and kept in ConnDOT's files. There is no request to introduce extra-record evidence such as technical reports that ConnDOT and FHWA should have considered but did not, or post-hoc justifications for inadequately reasoned past decisions. *See* Memorandum in Support of Defendants' Joint Motion to Supplement Administrative Record [doc. #85] ("Defendants are not asking the Court to consider any testimony or other extra-record evidence, but rather a discrete number of documents which should have been included in the original record but were inadvertently omitted.").

As Plaintiffs concede, "[t]he designation of the Administrative Record . . . is entitled to a presumption of administrative regularity . . . absent clear evidence to the contrary." *Overton Park*, 401 U.S. at 740. Here, although the additional documents were not accompanied by a sworn

affidavit, Defendants in their papers have expressly represented to the Court that "the records sought to be added were all in existence prior to this suit and among the documents reviewed by [Conn]DOT and FHWA when they were performing their Environmental Assessment and Section 4(f) Evaluation." State's Supplemental Brief in Support of Defendants' Joint Motion to Supplement Administrative Record [doc. #95] at 3; Federal Defendants' Statement of Concurrence [doc. #91]. In view of the presumption of regularity that attaches to this explanation, and the Court's prior conclusion that all ConnDOT documents relating to the Interchange Project are properly considered part of the administrative record, the Court GRANTS Defendants' Joint Motion to Supplement Administrative Record [doc. #84]. Accordingly, for purposes of this decision, references to the administrative record incorporate all the documents contained in Defendants' exhibits 5, 6, and 7.

### III.    Findings of Fact

The Court bases its findings of fact on an extensive administrative record including over 300 pdf files on five CD-ROMs filed by FHWA, the supplemental documents submitted with Defendants' motion to supplement the administrative record, and the parties' three sets of Local Rule 56(a) statements. The parties can be assured that the Court has reviewed at length both the contents of all of the CDs as well as the parties' respective factual statements.[1]

---

[1]  The majority of documents in the administrative record are contained on a single CD-ROM,  FHWA Exhibit 1. FHWA assigned each document on that CD a file number, an index to which was filed as Attachment 1 to Document 59. To avoid littering the account below with cumbersome citations, the Court will cite to each document on FHWA Exhibit 1 solely by its file number as listed in the index [doc. #59-1].  Citations to files on the other CD-ROMs will include the exhibit number. The documents supplied through Defendants' motion to supplement are associated with Exhibits 5 and 7.  Because some documents are unnumbered in the original, and because certain files consist of a compilation of documents with non-consecutive page numbering, the Court will follow the convention adopted by the parties, which is to cite to files in the administrative record by referencing  the page number indicated by the pdf software. Readers should be aware that the software page references may or may not coincide with any number indicated on

A.    The Merritt Parkway

The Merritt Parkway  is a thirty-eight mile stretch of scenic highway running east from the New York State line in Greenwich, Connecticut, to the Housatonic River. As a result of a variety of unique architectural, engineering, and historic features, including seventy-two bridges in a variety of modern architectural styles (sixty-five of which are formally listed as "contributing factors" to the historic significance of the Parkway), the Merritt Parkway was listed on the National Register of Historic Places in 1991. That designation brought the Merritt Parkway within the protective ambit of Section 106 of National Historic Preservation Act, 16 U.S.C. 470f, and hence Section 4(f) of the Department of Transportation Act. Of the numerous bridges on the Merritt Parkway, three are located within the area of the Interchange Project: the Main Avenue Bridge, a classical revival, rustic design stone arch bridge over Main Avenue that was listed as a contributing element to the historic value of the Merritt Parkway in the 1991 nomination of the Parkway for the National Register; the Norwalk River Bridge, a triple-arched concrete bridge across the Norwalk River; and a concrete skew-span bridge over the Metro North right of way, west of the Norwalk River. All three of these bridges date to between 1936 and 1938. In addition, the Interchange Project will also affect the stone-arched Glover Avenue Bridge, which is not on the Parkway but is independently eligible for listing on the National Register of Historic Places and therefore is subject to the requirements of Section 4(f).

In 1994, ConnDOT developed comprehensive planning, maintenance, and landscaping specifications for the Parkway, namely the Merritt Parkway Landscape Master Plan and the Merritt

the original document.

Parkway Guidelines for General Maintenance and Transportation Improvements. These were followed at some point before 1999 by the Merritt Parkway Conservation and Restoration Plan: Bridge Restoration Guide. These three documents will be referred to collectively as the "Merritt Parkway Guidelines" or "Guidelines." Development of the Merritt Parkway Guidelines was integral to Commissioner Frankel's  determination (previously quoted) that "the Merritt Parkway should receive special treatment, particularly in the areas of design, landscape, and maintenance procedures . . . based on [its] listing in the National register of Historic Places, its designation as a State Scenic Road, and its aesthetic value."

The Guidelines are comprehensive and set forth detailed objectives and specifications relating to all aspects of the Merritt Parkway. By their terms, the Guidelines, which do not always follow contemporary highway design standards, are intended to preserve and protect the unique features of the Parkway. The stated premise of the Guidelines for General Maintenance and Transportation Improvements is "that the Parkway is a distinct type of roadway, having an aesthetic as well as a transportation function, and should not necessarily receive the same type of treatments as Connecticut's expressways, particularly in the areas of design and landscape." Furthermore, the Guidelines teach that "[a]ll of the elements of the roadway, including the landscaping, bridge architecture, signs, guiderails, grass shoulders, curbing, rest area lighting, etc., are parts of the Merritt's character and should be viewed in a parkway context." FHWA Ex. 3, File 2 at 4.

In order to monitor compliance with the Merritt Parkway Guidelines, ConnDOT also created the Merritt Parkway Advisory Committee ("MPAC"), which currently includes representatives of the following entities: FHWA; ConnDOT; the Connecticut Historical Commission; the Connecticut Trust for Historic Preservation; the Connecticut Chapter of the American Society of Landscape

15

Architects; the Connecticut Society of Architects; the Southwestern Regional Planning Agency; the Greater Bridgeport Regional Planning Agency; each town along the Merritt corridor; and the Merritt Parkway Conservancy, a Plaintiff in this action.

B.    The Interchange Project

The current controversy arises from ConnDOT's plans to improve traffic flow and safety by reconstructing the interchange between the Merritt Parkway and Main Avenue in Norwalk, and by creating in the same area what the FHWA described at oral argument as a "massive interchange" providing full access from all directions between the Merritt Parkway and U.S. Route 7. The Interchange Project has a lengthy history dating back over thirty years, to a time when the Merritt Parkway was not listed on the National Register of Historic Places, and when design plans were not subject to review for compliance with Section 4(f) or the Guidelines.

The Interchange Project began as a sub-component of a larger plan in the 1970s to construct a slightly relocated and much wider U.S. Route 7 for nineteen miles between I-95 in Norwalk, north to I-84 in Danbury. This was known as the "Super 7 Project."  In 1974, ConnDOT released a draft Environmental Impact Statement (EIS) concerning the Super 7 Project that included plans for a fully directional four-level interchange between Super 7 and the Merritt Parkway in Norwalk. The Super 7 Project ran into difficulties and by 1984, ConnDOT had (at least temporarily) shelved plans for the middle portion of the Super 7 Project.  Instead, at the Danbury end, ConnDOT proposed an approximately four-mile southerly extension. At the Norwalk end, the Super 7 plans were downsized to construction of just over two miles of a two-lane freeway between I-95 and Grist Mill Road in Norwalk, with only a partial interchange permitting movement between Route 7 and the Merritt Parkway to or from the west. The two short extensions were both ultimately built, but access

16

between the Parkway and Route 7 to and from the east remained problematic, being accomplished indirectly via the Merritt Parkway / Main Avenue interchange located 500 meters to the east of the Route 7 / Merritt Parkway interchange. *See* File 16, at 6-8.

Funding and other constraints continued to prevent realization of the full Super 7 Project. However, by 1993 ConnDOT had decided to pursue two components of the Project: extending the Super 7 as far as Route 33 in Wilton (the "Freeway Extension"); and reconstructing the Route 7 / Merritt Parkway interchange to provide a fully directional exchange – that is, access from the east as well as the west (the "Interchange Project"). File 31 at 1.

C.    The Purcell Report

In 1993, ConnDOT commissioned Purcell Associates Engineering to produce a report (the "Purcell Report") assessing options for constructing the Route 7 / Merritt Parkway interchange. The Purcell Report examined six alternative designs for a fully directional interchange between Route 7 and the Merritt Parkway in Norwalk. The criteria used by Purcell to evaluate these design options are listed in the Report as follows:

- Connecticut DOT Guidelines for Highway Design, January 1990.
- A Policy on Geometric Design of Highways and Streets, 1990 Edition, published by American Association of State Highway and Transportation Officials (AASHTO).
- A Policy on Design Standards - Interstate System, December 1988, published by American Association of State Highway and Transportation Officials (AASHTO).
- Guidelines for Highway Design, January 1990 and Bridge Design Manual, September 1985, Connecticut Department of Transportation.
- Standard Specifications for Highway Bridges, 1989, American Association of State Highway and Transportation Officials.
- Specifications for Highway and Bridge Design by Contracting Engineers, and Drainage Manual, Connecticut Department of Transportation.
- Highway Capacity Manual, 1985 and the Manual on Uniform Traffic Control Devices, 1988 Edition.

17

•       Merritt Parkway Commission [R]equirements.
The design criteria has [sic] been carefully studied and utilized to incorporate as
much of the existing roadways and ramps as possible, minimize wetland impact,
right-of-way acquisition and to meet the proposed plans of the communities served
by this project.

File 45 at 5. At oral argument, the parties agreed that Purcell could not have measured the alternative

designs it studied against the Merritt Parkway Guidelines, because the Guidelines were not published

until 1994, after the Purcell Report was completed.  The parties were unable to identify the document

listed in the Purcell Report as "Merritt Parkway Commission Requirements" or surmise what those

"Requirements" may have been.

    In recommending the second of the six alternative interchange designs for further study and

development, the Purcell Report highlighted "its simplistic geometric features, less right-of-way

impact and less intrusive vistas with the Merritt." File 45 at 16.  However, there is no question that

Purcell did not assess the design's impact on the historic features of the Merritt Parkway, or

otherwise apply historic preservation considerations to the choice of design.  Indeed, the record

suggests that Purcell was informed by ConnDOT that the agency itself would take care of

considering the environmental and historic issues raised by the alternative designs.  File 35 at 3, ¶ 5.

    The record, as supplemented by the recently discovered ConnDOT documents, reflects that

the interchange design recommended by Purcell in 1993 underwent at least one fairly radical revision

with major implications for the historic fabric of the Merritt Parkway. In early 1995, ConnDOT

apparently considered further design alternatives, one of which proposed to increase the width of

Main Avenue from five lanes to six, and alter the location of Ramp C. *See* Defendants' Ex. 5, Files

8, 9, 10. The only information in the record about this decision to add a lane to Main Avenue is

contained in the brief reports of three meetings in February and March 1995. The report of the March

6 meeting summarizes ConnDOT's findings with respect to the six-lane design as follows:

> The[e six-lane] alternative provides . . . better and safer traffic operation in
> the interchange area. The main disadvantage . . . is that it eliminates the possibility
> of replicating the existing structure type for Route 15 over Main Avenue.
> It was resolved that the six lane alternative be pursued in the preliminary
> design phase because of its superior traffic carrying capabilities and the fact that the
> Route 15 over Main Avenue structure can be done with architectural treatments to
> resemble the existing structure.

Defendants' Ex. 5, File 10 at 3.  Thus, the change from a five to six-lane alternative meant the

demolition of the Merritt Parkway's Main Avenue Bridge.

The record does not reflect that during this time period ConnDOT or FHWA undertook any

written assessments of the relative harm to the Merritt Parkway posed by the various design

alternatives being considered by ConnDOT and Purcell.  However, the additional documentation

from 1995 provided by ConnDOT shows that during this early period ConnDOT and Purcell worked

diligently and commendably to develop a design for the Interchange Project that was aesthetically

appropriate for the Merritt Parkway. For example, Purcell drew up three designs for the structure that

would replace the Main Avenue Bridge, expressly noting that "[i]n accordance with the Merritt

Parkway Commission guidelines and in order to maintain the architectural significance of the

existing bridge, the recommended alternate for the replacement of the bridge will have a similar

shape and appearance." *See* Defendants' Ex. 5, File 20 at 4. Similarly, the 1995 Structure Type Study

for Glover Avenue Bridge over the Merritt Parkway discussed at some length the architectural

concept behind the designs of the replacement bridges, namely "to 'replicate' the existing bridges as

much as possible . . . by architectural massing and materials which are either identical or similar to

the originally designed and constructed bridges." *See* Defendants' Ex. 5, File 17 at 18. The study stated that "[t]he bridge abutments and arches of the newly designed bridges will be constructed of natural stone similar in size and color to the original bridges." *Id.* With respect to the design of new bridges called for by the Project, the study noted that "each of the[] [new] bridges has been designed with a similar architectural vocabulary . . . with many of the architectural elements designed as variants of other existing Merritt Parkway Bridges." *Id.*

D.    The 1998 Draft EA

Inexplicably, the administrative record is largely silent as to what transpired with respect to the Interchange Project between 1995 and 1998. However, in April 1998, ConnDOT and FHWA released a draft federal Environmental Assessment / Section 4(f) Evaluation ("Draft EA") evaluating the Freeway Extension and the Interchange Project. The Draft EA discussed several options for the Freeway Extension project, including Build, No-Build, TSM / Transit (improving the existing Route 7 infrastructure to improve traffic flow), and Widening (widening the exiting Route 7). The Freeway Extension was the option recommended by the Draft EA.

With respect to the Interchange Project, the Draft EA presented only a Build and a No-Build option. The document concluded that the No-Build option was infeasible because it would result in "continued use of a congested arterial . . . increased congestion and accidents." File 126 at 311. The Draft EA did not include discussion of any alternatives within the Build option, *see id.* at 324 ("[T]here is *one* build alternative for the interchange project and four build alternatives for the Route 7 freeway extension project.") (emphasis added).  Thus, the Draft EA does not mention either the 1993 Purcell Report, with its six alternative build options, or ConnDOT's 1995 decision to select a

20

six-lane alternative for Main Avenue (with the consequent demolition of the Main Avenue Bridge) over a five-lane option.

Yet, at the time the Draft EA was produced in 1998, ConnDOT had already known for three years that the Main Avenue Bridge would have to be removed, and that it would not be possible to replace it exactly "in kind" as required by the Merritt Parkway Guidelines. *See* Defendants' Ex. 5, Files 8, 9, 10.  Still, the Draft EA did not mention the anticipated removal of the Main Avenue Bridge under the EA's list of impacts. The omission of this information regarding the Main Avenue Bridge is in stark contrast to the express disclosure of the need to demolish the historic Glover Avenue Bridge. *See* File 126 at 323. Notably, the Draft EA contained a schematic of the work proposed for the Merritt Parkway that shows all the bridges: The Glover Avenue Bridge is marked with the notation "Bridge to be Replaced," while the Main Avenue Bridge is unmarked. *See* File 126 at 317.

Apart from the explicit disclosure of the expected demolition of the Glover Avenue Bridge, the Draft EA provided only a generalized statement of potential impacts to historic properties in the path of the Interchange Project:

> The Build Alternative would affect the Merritt Parkway and the Glover Street Bridge . . . roadway, ramp and bridge modifications . . . would involve impacts to the parkway, ramps, and three bridges that contribute to the Parkway's historic significance . . . Elements of the Merritt Parkway's existing historic fabric such as ornamental parapets, railings, balustrades, and mature landscaping *may be* impacted. Historic bridge abutments, barrels, piers, and other features *may also be* affected.

File 126 at 322 (emphasis added).  According to the Draft EA, the reason for this vagueness about the specific effects of the Interchange Project on the Merritt Parkway was that "[s]ince the project has not undergone final design detailing it is possible only to generalize as to what extent the existing

historic features of the Merritt Parkway would be affected." *Id.* Therefore, the Draft EA described

the efforts to minimize and mitigate harm to historic resources as required by Section 4(f) in terms

of a process that would occur in the future:

> ConnDOT is coordinating with the SHPO and the Merritt Parkway Commission to minimize impacts to historic features of the Parkway and to develop mitigation strategies. The modifications . . . will be evaluated for consistency with the *Merritt Parkway Landscape Master Plan* . . . and the *Merritt Parkway Guidelines for General Maintenance and Transportation Improvements* . . . Measures to minimize harm . . . will be included in the Memorandum of Agreement MOA to be developed between ConnDOT and the SHPO, which will be included in the Final EA.

*Id.* (emphasis in original).

E.     Cooperation with Other Agencies, Section 106 Documentation and the MOA

Because the Glover Avenue Bridge was a National Register eligible property, Connecticut's

State Historic Preservation Office, which is charged with monitoring compliance with the NHPA,

expressed concerns about the fate of the bridge under the design of the Interchange Project proposed

in the Draft EA. The State Historic Preservation Office also indicated that the Project had the

potential adversely to affect the other historic bridges and the landscape of the Merritt Parkway.

Section 4(f) also requires FHWA to cooperate and consult with the Department of Interior

(DOI) on transportation projects affecting natural and cultural resources. *See* 23 U.S.C. § 138.  The

DOI echoed the State Historic Preservation Officer's concern. In a 1998 letter to FHWA, the DOI

stated, "*[w]e do not believe that all possible planning has been done to minimize harm to historic

and archeological resources.*" File 155 at 1 (emphasis added).  The DOI "recommend[ed] continued

cooperation and coordination with the State Historic Preservation Officer (SHPO) in order to

determine the impacts . . . on historic and archeological resources, and to prepare a memorandum

of Agreement (MOA) to avoid and/or mitigate the impacts on those resources." *Id.*  It appears that

22

such an MOA was drafted because, in July 1998, the DOI sent another letter to FHWA, stating that it "concur[s] with the proposed measures to minimize harm to archeological and historic properties as outlined in the draft Memorandum of Agreement." File 169 at 1. In conclusion, DOI stated that it "has no objection to Section 4(f) approval of this project . . . *providing that the mitigation measures to archeological and historic properties . . . are adequately addressed in the Final Section 4(f) Evaluation.*" File 169 at 2 (emphasis added).

In February 1999, FHWA and ConnDOT produced a report on the impacts of the Freeway Extension and Interchange Project on historic and archeological resources as required by Section 106 of the National Historic Preservation Act. *See* File 175. The language of the Section 106 documentation is in large measure identical to that of the Draft EA. *Compare, e.g.*, File 175 at 33, *with* File 126 at 322. Thus, like the Draft EA, the Section 106 documentation acknowledged in generalized language that elements of the Merritt Parkway's historic fabric and features might be affected by the Interchange Project, and that the Glover Street Bridge would be removed, *see* File 175 at 33, but the Section 106 documentation deferred providing any specifics as to the harm to historic properties pending final design detailing.  The Section 106 documentation also did not mention that the Main Avenue Bridge would be demolishsed.

In November 1999, in accordance with the DOI's recommendation, FHWA and the State Historic Preservation Officer entered into a Memorandum of Understanding (MOA) that included the following undertaking, central to the current dispute.  In the MOA, FHWA agreed to "*ensure the following measures are carried out*":

> FHWA and/or ConnDOT shall provide the Merritt Parkway Advisory Committee with an opportunity to review and comment on the final design and landscape

23

treatment for the Merritt Parkway - Route 7 interchange improvements. Modifications to the Merritt Parkway shall be consistent to the extent feasible with ConnDOT's Merritt Parkway Master Plan, the Merritt Parkway Guidelines for General Maintenance and Transportation Improvements and the Merritt Parkway Conservation and Restoration Plan: Bridge Restoration Guide.

File 198 at 1 (emphasis added).  ConnDOT also signed the MOA under the word "Concur." As FHWA conceded at oral argument, by its express terms, the MOA commits FHWA and ConnDOT: (1) to provide  MPAC an "opportunity to review and comment on the final design and landscape treatment" for the Interchange Project; and (2) to ensure that any modifications to the Parkway are "consistent to the extent feasible with" the Merritt Guidelines.

F.    The Final EA

In December 2000, two-and-a-half years after publication of the Draft EA, and one year after execution of the MOA, FHWA released its Final EA / Section 4(f) Evaluation for the Interchange Project ("Final EA"). The Final EA acknowledged ConnDOT's decision not to move forward with the Freeway Extension project. Instead, ConnDOT would proceed with a so-called Widening Alternative, which "represent[ed] a substantial reduction in environmental impacts compared with the Freeway [Extension] Alternative . . . [and] the best balance of transportation service, protection of sensitive environmental resources, and cost." Final EA [doc. #7, ex.1] at 10.

With respect to the Interchange Project, the Final EA (like the Draft EA) stated that two alternatives, Build and No-Build, had been considered. *See* Final EA [doc. #7, ex. 1] Section 4(f) Evaluation at 26 ("The 1998 Draft EA / FONSI evaluated a Build and No-Build alternative for the interchange improvements and several build alternatives . . . and a No-Build alternative for the Route

7 corridor improvements.").[2]

The Final EA again explicitly pointed out that the Glover Avenue Bridge would be replaced. It also noted that "[i]mpacts to other bridges cannot be avoided under the Build Alternative, because the project includes the construction of new ramps at Bridge No. 530, which must extend to Bridges Nos. 720 and 721 to provide for adequate geometry." *Id.* at 23.  However, as in the Draft EA and the Section 106 documentation, and by contrast with the discussion of the Glover Avenue Bridge, the Final EA never mentioned the fact that the plans for the Interchange Project required the demolition of the Main Avenue Bridge, that the Project had rejected a five-lane alternative in favor of a six-lane alternative for Main Street, or why.

Like the Draft EA and the Section 106 documentation, the Final EA contained no description of any efforts the parties had already undertaken to minimize or mitigate harm to the Merritt Parkway. Instead, the Final EA again deferred assessment of the likely impacts and the appropriate mitigation pending final design detailing.  *Id.* at 21. Accordingly, the Final EA stated that "modifications to the Merritt Parkway *will be evaluated for consistency with* the Merritt Parkway Master Landscape Plan . . . and the Merritt Parkway Guidelines for General Maintenance and Transportation Improvements," *id.* at 28 (italics in original omitted; emphasis added), that "*[d]uring development of the build alternatives*, measures to avoid impacts to existing cultural and natural resources . . . *will be investigated*," *id.* (emphasis added), and that "[s]tipulations in the MOA *will*

_____

[2] The pdf file containing the Final Environmental Assessment / Section 4(f) Evaluation appears to be missing a variety of pages. Therefore, the Court cites instead to a hard copy of the Final EA filed by the Plaintiffs as Exhibit 1 to Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction [doc. #7]. The page numbers in the hard copy document start over at the section dealing with the Final 4(f) assessment, so references to that section will be explicitly labeled as such.

*be followed* during implementation of the project ensuring that the impacts are properly mitigated,"
*id.* at 29 (emphasis added).  By explicitly incorporating the stipulations of the MOA in the Final EA,
FHWA again committed to providing MPAC with an opportunity to review and comment on the
final design and, most importantly, FHWA committed to "evaluating" modifications to the Parkway
for consistency with the Merritt Parkway Guidelines and to "investigating" "build alternatives" to
ensure that the final design was consistent with the Merritt Parkway Guidelines to the "extent
feasible." *Id.*

On January 30, 2001, just six weeks after the Final EA had asserted that final design detailing
had not been completed and had stated that "development of the build alternatives" would be
"investigated," ConnDOT wrote to FHWA requesting approval for the design of the Interchange
Project. During that six-week period there is nothing in the administrative record that shows that any
build alternatives were being developed, let alone investigated for compliance with the Merritt
Parkway Guidelines. Nevertheless, the Division Administrator of FHWA signed his concurrence to
the design plan on February 1, 2001.  File 237 at 3.

Plaintiffs assert that this action by the Division Administrator constituted final approval of
the Interchange Project for purposes of Section 4(f) analysis.  However, FHWA points out that
ConnDOT-requested exceptions to the design standards for the project as late as November 2001,
File 238, and only submitted plans characterized as 90% final in December 2001, File 242.  As a
result, FHWA insists that its approval of the final design of the Interchange Project did not occur
until December 2001.  The administrative record contains no written approval or signature of the
Interchange Project as a whole by FHWA in the November / December 2001 time-frame, although
it does reflect that FHWA signed off on the ConnDOT requested design exceptions on the same day

they were requested, November 9, 2001. File 238 at 17.

The Court regrets the lack of clarity on this critical issue of the date of final design approval given how important that date is to the Section 4(f) process.  Nonetheless, a  presumption of regularity attaches to agency representations and decisions. *See, e.g.*, *Overton Park*, 401 U.S. at 740 ("The designation of the Administrative Record . . . is entitled to a presumption of administrative regularity."); *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed. Cir. 2004) (holding that the presumption of regularity may be employed to establish "that certain ministerial steps were taken in accordance with the requirements of law").  Therefore, in view of this presumption of regularity, the Court is willing to give Defendants the benefit of the doubt and accept their contention that the final design approval came in December 2001, not in February.

G.     MPAC Meetings Discussing the Interchange Project Prior to Final Approval

Since the MOA stipulates that MPAC would be given an opportunity to review and comment on the design for the Interchange Project, the Court reviewed the administrative record to determine what MPAC saw and when.  Most of the information about when MPAC met and what it discussed is found in the administrative record at File 313, a compilation of documents entitled "Index for Merritt Parkway Advisory Committee Meetings, May 3, 1995; March 15, 2000 - June 23, 2005." *See also* Federal Defendant's Local Rule 56(a)(1) Statement [doc. #53] ¶ 49.  In addition, details of MPAC meetings may be gleaned from two of Defendants' supplemental documents, and one other file that the Court located in the hundreds of pdf files submitted on disk. *See* Defendants' Ex. 5, Files 27, 29; Defendants' Ex. 1, File 86. The administrative record also documents two public hearings on the Project in March and June 1998, which the Court thought it useful to examine even though they were not MPAC meetings. Files 149, 166.

27

From these documents it appears that MPAC discussed the Interchange Project in at least six meetings over the decade from 1995 to 2005. The minutes of the May 2, 1995, meeting reflect that it was announced that "the Route 15 structure over Main Ave would be replaced to allow for the widening of Main Ave to 6 lanes," and that "Glover Ave would also be widened on the approach to Main Ave which will require the replacement/widening of the structure over the Norwalk River." File 313 at 5. Thus, it is clear to the Court that, by May 1995, MPAC had been advised that both the Glover Avenue Bridge and the Main Avenue Bridge would be removed. The minutes of a meeting held in August 1995 demonstrate that MPAC was also aware of ConnDOT's intention to construct at least some ramps well above the grade of the Merritt Parkway, and that MPAC had voiced its concerns about the aesthetic implications of such a design choice. *See* Defendants' Ex. 5, Files 27, 29.

As the Interchange Project moved into 1996, another MPAC meeting appears to have been held, but the report of the April 1996 meeting does not reveal what aspects of the Project, if any, were actually discussed at the meeting.   The next occasion on which MPAC might have offered input on the Interchange Project appears to have been the two public hearings held in March and June 1998.  At the March hearing, the public was informed that with respect to the Interchange Project "proposed ramps should not be elevated above the Merritt Parkway," and "[c]onstruction of improvements on or near the Merritt Parkway must replicate existing architecture." File 149 at 24. There is no mention of the demolition of the Main Avenue Bridge or of the fact that some of the ramps would in fact be elevated significantly *above* the Parkway. Nonetheless, other documents in the record make it clear that MPAC knew that at least some ramps would be elevated well above the Parkway and had indeed expressed its concerns on this point. *See* Defendants' Ex. 5, Files 27, 29.

28

Moreover, photographs of a 1994 model of the Interchange Project also make it very clear that certain ramps would pass over rather than under the Merritt Parkway. *See* Defendants' Ex. 5, File 6.

The public comments that followed the description of the project focused almost entirely on the Freeway Extension rather than the Interchange Project. The current administrative record does not contain a transcript of the June 1998 public hearing and therefore it is not possible to ascertain the substance of the discussion at that meeting from the administrative record.

The next MPAC meeting at which the Interchange Project was discussed occurred in March 2000. File 313 at 12. The project description appended to the proposed agenda for this meeting lists as "[m]ajor elements of this project" the "[w]idening and modifications to 3 existing bridges," and "[i]mpact to 5 properties." *Id.* at 16. According to the minutes of this meeting "[i]t was stated that the new ramps will be constructed *below* the grade of the MP to minimize visual impact." *Id.* at 31 (emphasis added). However, there is no indication in the record which of the numerous ramps involved in the design are referred to by this comment and, as noted above, other documents in the record make it clear that MPAC already knew that some of the ramps involved in the Interchange Project would be elevated well above the grade of the Parkway. *See* Defendants' Ex. 5, Files 6, 27, 29. With respect to bridges, the minutes of the March 2000 MPAC meeting reflect only an undertaking that "[t]he project will match the Norwalk River structures with the Main Avenue structures." *Id.* at 32. This matching was to be achieved through "a veneer that will simulate a stone structure. Form liners will create the effect as the concrete is poured." *Id.* MPAC met again in October 2000, but the Interchange Project is not listed on the agenda and the minutes do not reflect that it was discussed. *Id.* at 47.

Between February 2001, when ConnDOT sought design approval for the Project, and

December 2001, when FHWA asserts that its approval became final, the record reflects that MPAC

met only once, on July 12, 2001. *See* File 313 at 1. According to ConnDOT, this was the meeting

at which it presented the final plans for the Interchange Project. *See* File 288 at 2 (asserting that "[i]n

July of 2001, the Department presented the final plans for the Project"). However, the only item on

the agenda relating to the Interchange Project is described as "Architectural Bridge Treatments," File

313 at 72, and, according to the minutes of the meeting, "the primary issue is [whether] to utilize

formed concrete surfaces that duplicate[] the appearance of natural stone," *id.* at 80. The minutes do

not reflect any presentation or discussion of full final plans for the Interchange Project.

To summarize, by February 1995, the Interchange Project designs called for demolition of

the Main Avenue Bridge, its replacement with a different kind of structure, and for the construction

of certain ramps elevated 13-32 feet (4-10 meters) above the grade of the Merritt Parkway. However,

although the record demonstrates that MPAC knew about these design decisions, none of the

subsequently prepared statutory-compliance documentation – not the Draft EA, the Section 106

report, or the Final EA – ever mentioned these impacts on the Merritt Parkway, assessed any feasible

alternatives to them or evaluated any means of minimizing the harm to the Merritt Parkway.  The

record does clearly indicate that, at least during 1995, ConnDOT had been cooperating with MPAC

on achieving aesthetic harmony between the Interchange Project design and the Merritt Parkway's

historical and architectural character.  However, FHWA's assessment documentation made no

reference to these efforts to mitigate harm or alternatives considered, but instead deferred providing

specifics regarding and evaluation or mitigation of the impacts on the Merritt Parkway's historic

fabric.  Furthermore, the FHWA asserted in the Final EA and promised in the MOA that further

evaluation, investigation, and mitigation was still to come, as the final plans and build alternatives

30

were developed, and that the Merritt Parkway Guidelines would be complied with to the extent feasible during that development process. Yet there is nothing in the administrative record to show that, following issuance of the Final EA and before final design approval in December 2001, FHWA ensured that the promised investigation of measures to minimize harm had been undertaken, that the designs for the Interchange Project had been evaluated for consistency with the Merritt Parkway Guidelines, or that deviations from the Guidelines had been approved only after a determination that compliance with them was not feasible. Of course, that gap in the administrative record does not necessarily mean that such efforts did not occur; it only means that there is no written record of any such efforts.

H.    Post-Approval Activity

FHWA asserts that it gave final approval to the Project in December 2001. In March and December of 2002 there were further MPAC meetings, but it does not appear that the Interchange Project was a subject of discussion at either of these meetings. In October 2003, FHWA wrote to the Advisory Council on Historic Preservation[3] stating that FHWA had determined that the Interchange Project would have an adverse effect on the Merritt Parkway and the Glover Avenue Bridge, and that FHWA and the State Historic Preservation Officer had agreed that "there is no feasible and prudent alternative to avoid these impacts." File 260 at 1. The details of the analysis that led FHWA and the State Historic Preservation Officer to this conclusion are not disclosed in the record before the Court. FHWA informed the Advisory Council that the State Historic Preservation Officer, ConnDOT, and

_____

[3]  The Advisory Council on Historic Preservation is an independent Federal agency created by Congress to advise the President and Congress on historic preservation matters and administer the protective process for historic properties under Section 106 of the National Historic Preservation Act. *See* http://www.epa.gov/rivers/achp.html; http://www.achp.gov/aboutachp.html.

FHWA had agreed to execute a Memorandum of Agreement and invited the Advisory Council on Historic Preservation to "participate in the consultation to avoid the adverse impacts of this project." *Id.* at 2.

In November 2003, the State Historic Preservation Officer wrote to ConnDOT expressing his sense that substantive design changes had occurred on the Interchange Project and that the MOA should be revised accordingly. *See* File 268 at 1. It does not appear from the record what substantive changes the State Historic Preservation Officer had in mind, and ConnDOT denied that there had been any such changes. *See* File 273 at 1. Nonetheless, a revised MOA was negotiated to account for the discovery of archeological sites after the signing of the original MOA in 1999. The revised MOA was executed by ConnDOT on November 14, 2003, by the State Historic Preservation Officer on August 11, 2004, and by FHWA on May 31, 2005. *See* File 278.

In June 2004, ConnDOT put the Interchange Project out to bid.  In October 2004, Plaintiff Merritt Parkway Conservancy (the "Conservancy") purchased a copy of the final plans for the Interchange Project on file with ConnDOT.  Even though it was a member of MPAC, the Conservancy asserts that it had not previously seen or received a copy of the final plans for the Interchange Project.  Thereafter, the Conservancy sent an email to ConnDOT expressing its concerns about the final design, but was informed that "[s]ince the design is complete and construction bids have been received, changes to the layout of the improvements (e.g., ramp elevations) would not be possible, however variations in the landscape details could probably be accommodated." File 281.

In March 2005, the Interchange Project was featured on MPAC's agenda for the first time since July 2001, and the minutes reflect that the Conservancy again expressed its concerns about the final plans for the Project. *See* File 313 at 240.  Following this meeting, ConnDOT wrote to FHWA

setting forth its understanding that it had fully complied with the requirements of the MOA.  File 288. ConnDOT's letter discussed its efforts to satisfy the MOA requirement of coordination with MPAC, detailing the five MPAC meetings convened between May 1995 and March 2005. *Id.* at 4-5. Notably, however, ConnDOT's letter did not address the MOA requirement that modifications to the Parkway be consistent to the extent feasible with the Merritt Parkway Guidelines. Indeed, at no point in the letter did ConnDOT affirmatively represent to FHWA that the final design was consistent to the extent feasible with the Merritt Parkway Guidelines, and nothing in the record indicates that FHWA itself ever undertook any inquiry or assessment into whether that requirement of the MOA had been satisfied.

On April 5, 2005, ConnDOT convened a public meeting at which the final plans for the Interchange Project were presented. ConnDOT proceeded to award a construction contract for the first phase of the Interchange Project on April 18, 2005.  Construction, including blasting and other demolition work, began shortly thereafter.

### IV.   Summary Judgment

Plaintiffs have alleged violations of Section 4(f)(2), NEPA, and the NHPA, and have moved for summary judgment on all counts. *See* Plaintiffs' Motion for Summary Judgment [doc. #44]. Defendants have filed cross-motions for summary judgment. *See* Federal Defendant's Cross-Motion for Summary Judgment [doc. #60]; Defendant ConnDOT's Cross-Motion for Summary Judgment [doc. #89]. All parties agree that the Court can and should decide these claims on the basis of the assembled administrative record.

As explained below, because the record does not demonstrate that FHWA ever determined that the Interchange Project, as finally designed and approved, complied with Section 4(f), nor ever

ensured that the commitments it had made in the MOA had been fulfilled, the Court concludes that a remand is appropriate on the Section 4(f) claim. With respect to Plaintiffs' remaining claims, the Court notes that Plaintiffs have argued "FHWA's review and approval of the Interchange Project suffers from the same flaws under NEPA as it does under Section 4(f)." Plaintiffs' Supplemental Summary Judgment Memorandum [doc. #90] at 7. Furthermore, Plaintiffs' claim under NHPA is based on the same failure to comply with the MOA that forms part of Plaintiffs' NEPA and Section 4(f) claims, and Plaintiffs have sought the same relief under all three counts of their Complaint, namely an injunction and a remand to the agency with instructions to cure the defects in its compliance. Therefore, the Court concludes that it need not, and accordingly does not, reach Plaintiffs' alternative grounds for the identical relief under NEPA and NHPA. Since the Court has concluded that a remand for further proceedings is necessary, Defendants will find it prudent to address Plaintiffs' claims under NEPA and NHPA while the matter is before the agency on remand.

### A.

Section 4(f) of the Department of Transportation Act provides in relevant part as follows:

> It is declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the *Secretary shall not approve any program or project* (other than any project for a park road or parkway under section 204 of this title) which requires the use of . . . any land from an historic site of national, State, or local significance as so determined by such officials *unless* (1) there is no feasible and prudent alternative to the use of such land, and (2) *such program includes all possible planning to minimize harm* to such . . . historic site resulting from such use.

23 U.S.C. §138(a) (emphasis added). Notably, whereas "Section 106, like NEPA, is essentially a procedural statute," "section 4(f) . . . imposes a substantive mandate on the Administration: It prohibits the agency from taking an action that 'uses' a historic resource unless there is 'no prudent and feasible alternative to using that land' and the agency engages in 'all possible planning' to 'minimize harm' to the sites." *City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999). Furthermore, the "substantive mandate," *id.*, imposed by Section 4(f) is "stringent," *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1447 (9th Cir. 1984).

Plaintiffs concede that there is no prudent and feasible alternative that avoids all impact to the Merritt Parkway, so their challenge is not mounted under Section 4(f)(1). Instead, Plaintiffs allege that FHWA violated the Section 4(f)(2) requirement to ensure that the Project included all possible planning to minimize harm to protected historic resources. The Second Circuit has held that "[t]he affirmative duty to minimize the damage to [historic resources] is a condition precedent to approval for such a taking for highway purposes where federal funds are involved; and the Secretary must withhold his approval unless and until he is satisfied that there has been, in the words of the statute, 'all possible planning to minimize harm.'" *Monroe County Conservation Council v. Volpe*, 472 F.2d 693, 700-01 (2d Cir. 1972). Thus, to satisfy the substantive mandate of Section 4(f)(2), the record must indicate that FHWA ensured that the Interchange Project "minimized harm" to the Merritt Parkway prior to final approval.

Section 4(f)(2) itself does not elaborate on what constitutes "all possible planning to minimize harm." However, case law and FHWA publications indicate that the duty to minimize harm has two components. First, harm minimization requires FHWA to consider alternatives that result in less or less-drastic use of a Section 4(f) resource. *See Druid Hills Civic Ass'n, Inc. v.*

*Federal Highway Admin.*, 772 F.2d 700, 716 (11th Cir. 1985) ("Relocation of the highway through another portion of the section 4(f) area or through other section 4(f) properties must be considered as a means of minimizing harm."); *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 694 (3d Cir. 1999) (same); *Louisiana Environmental Society, Inc. v. Coleman*, 537 F.2d 79, 85-86 (5th Cir. 1976) (same); FHWA Section 4(f) Policy Paper ("FHWA Policy Paper") at 7, *available at* http://environment.fhwa.dot.gov/projdev/4fpolicy.pdf ("Minimization of harm entails *both alternative design modifications that lessen the impact on 4(f) resources* and mitigation measures that compensate for residual impacts.") (emphasis added). This does not mean that FHWA must choose the alternative that does the least harm to protected areas using any means technically possible. "Although there is no express feasible and prudent exception to subsection (2), the act clearly implies that one is present." *Louisiana Environmental Soc.*, 537 F.2d at 86. Thus, an alternative that minimizes harm can still be rejected if it is infeasible or imprudent. *Druid Hills*, 772 F.2d at 716.

Second, harm minimization requires "mitigation measures that compensate for residual impacts." FHWA Policy Paper at 7. In other words, whatever harm cannot be avoided by choosing between construction alternatives should be mitigated by design choices within the chosen construction option. Thus, if the only feasible construction plan requires removal of historic features, mitigation measures should be considered. Both aspects of FHWA's duty under Section 4(f)(2) – assessment of alternatives and consideration of minimization measures – are reflected in the commitments FHWA made in the MOA and the Final EA to investigate build alternatives to avoid impact to existing resources, to evaluate modifications for consistency with the Merritt Parkway Guidelines, and to ensure compliance with the Guidelines to the extent feasible.

FHWA's determination that the approved Interchange Project included all possible planning to minimize harm is reviewable under the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *See Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater*, 352 F.3d 545, 554 (2d Cir. 2003). Under this standard, "the power of a court in effectuating the purpose of judicial review . . . is narrowly drawn. Courts must defer to the action taken by the agency, which is presumed to be valid." *Sierra Club v. Army Corps of Engineers*, 772 F.2d 1043, 1051 (2d Cir. 1985). Nonetheless, although "the Secretary's decision [to approve highway route] is entitled to a presumption of regularity . . . that presumption is not to shield his action from a thorough, probing, in-depth review . . . consider[ing] whether the decision was based on a consideration of the relevant factors." *Overton Park,* 401 U.S. at 415-16 (internal citations omitted). Although FHWA need not have "consider[ed] in detail each and every conceivable variation of the alternatives stated," *Monroe County*, 566 F.2d at 425 (internal quotations and citations omitted), FHWA must set forth alternatives "sufficient[ly] to permit a reasoned choice," *id.* So long as the record is adequate to "insure that there was consideration of the relevant factors and [no] clear error of judgment," in FHWA's decision, *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) (internal quotation marks omitted), FHWA's "determination[] that a particular plan minimizes harm . . . deserves even greater deference than [an] agency determination concerning practicable alternatives," *Conservation Law Foundation v. Federal Highway Administration*, 24 F.3d 1465, 1476-77 (1st Cir. 1994).

## B.

Under the deferential standard of review and legal principles that guide this Court's review, FHWA needed only to present the Court with an administrative record tying its decision to approve

the final design of the Interchange Project to facts indicating: (1) that the feasibility and prudence of alternative construction designs with less impact on the Merritt Parkway had been evaluated; and (2) that mitigation measures compensating for residual impacts had been complied with to the extent feasible. Unfortunately, the administrative record supplied to the Court does not show that FHWA complied with these requirements.

With respect to the requirement that alternative designs be considered as a means of minimizing harm, neither the Draft nor Final EA set forth any alternative ways of building the Interchange Project. To the contrary, the Draft and Final EA both candidly admit that, by contrast with the Freeway Extension, the only options considered for the Interchange Project were Build and No-Build. *See* File 126 at 324 ("[T]here is one build alternative for the interchange project and four build alternatives for the Route 7 freeway extension project."); Final EA [doc. #7, ex. 1] Section 4(f) Evaluation at 26 ("The 1998 Draft EA/FONSI evaluated a Build and No-Build alternative for the interchange improvements and several build alternatives . . . and a No-Build alternative for the Route 7 corridor improvements.").[4] Although the EA makes clear that the No-Build alternative would not be feasible or prudent, it does describe any alternative build options, much less analyze how they might vary in respect to their impacts on the Merritt Parkway or their compliance with the Merritt Parkway Guidelines.

Recognizing this deficiency in its EA, FHWA has argued that the analysis of alternative construction designs included in the 1993 Purcell Report satisfied FHWA's obligation to consider and assess the feasibility of multiple designs to minimize harm. In supplementing the record, FHWA also supplied various plans and reports from 1995 which indicate that ConnDOT and Purcell were

_____

[4] For an explanation of the format of citations to the Final EA, see *supra* note 2.

actively incorporating the aesthetic requirements of the Merritt Guidelines into the plans under development at that time. However, the 1993 Purcell Report and the 1995 plans and reports are inadequate to satisfy the minimization requirement of Section 4(f)(2) for at least two reasons.

First, although the 1995 plans reflect clear attention to historic and aesthetic considerations, *see, e.g.*, Defendants' Ex. 5, Files 17, 20, the same is not true of the 1993 Purcell Report. As FHWA admitted at oral argument, there is simply no indication in the record that the 1993 Purcell Report embodies the kind of evaluation of harm minimization that Section 4(f)(2) requires. The Purcell Report does not purport to have analyzed the feasibility of the six design alternatives for their minimization of harm to historic resources. Rather, according to the Purcell Report, the "design criteria [were] . . . utilized to incorporate as much of the existing roadways and ramps as possible, minimize wetland impact, right-of-way acquisition and to meet the proposed plans of the communities served by this project." File 45 at 5. It is true that the Purcell Report apparently also considered something called the Merritt Parkway Commission Requirements, and FHWA speculated at the hearing that this may have been a reference to draft of the Merritt Guidelines published the following year. However, FHWA conceded that it was not in fact possible to determine from the administrative record what the "requirements" studied by Purcell really were.

Second, the Court notes that although Section 4(f) itself does not provide for written documentation of the basis for FHWA's conclusion that Section 4(f) has been satisfied, FHWA's Section 4(f) implementing regulations require that "evaluations of alternatives to avoid the use of section 4(f) land and of possible measures to minimize harm to such lands shall be developed by the applicant in cooperation with the Administration . . . *[and] presented in the draft EIS [or] EA*." 23 C.F.R. § 771.135(i) (emphasis added). Furthermore, "[w]hen adequate support exists for a section

4f determination,  the discussion in the final EIS [or] FONSI . . . shall specifically address . . . [a]ll measures which will be taken to minimize harm to the section 4(f) property." *Id.* (j). If the 1993 and 1995 reports were sufficient to satisfy the harm minimization requirement of Section 4(f)(2), the Court is at a loss to understand why the Final EA not only makes no reference to these documents (contrary to the FHWA's own regulations), but instead states that "*[d]uring development of the build alternatives*, measures to avoid impacts to existing cultural and natural resources . . . *will be investigated*," clearly indicating that the development of build alternatives was to occur *after* the publication of the EA because it could not have occurred previously.

The mere presence in the record of documents from which FHWA *might* have concluded that the requirements of Section 4(f)(2) had been met does not allow the Court to infer that FHWA in fact so concluded. Quite simply, this Court "is not empowered to substitute its judgment for that of the  agency." *SPARC*, 352 F.3d at 558. The Court understands that agency decisions are entitled to deference, and the Court is more than willing to accord that deference to the FHWA.  But before the Court can defer to the agency, "the agency must provide an adequate explanation for its actions, . . . [and] the explanation must show a rational connection between the facts found and the choice made," and "the required explanation must be articulated by the agency at the time of its action." *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001). As one district court has aptly noted, "[t]o require the Court to take on the task of reviewing the entire record in order to discover an adequate explanation for the agency's decision not only presents an undue burden but, as already noted, creates a risk that the Court may rely on evidence that the [agency], the presumable expert in the matter, did not in fact rely upon." *Maryland Native Plant Society v. U.S. Army Corps of Engineers*, 332 F. Supp. 2d 845, 859 (D. Md. 2004).

Section 4(f)(2) requires FHWA to have considered alternative ways of constructing the Interchange Project that would minimize harm to the Merritt Parkway.  It may be that all such designs would have been extraordinarily expensive or utterly inadequate to meet traffic flow and safety needs, and thus infeasible and imprudent under Section 4(f)(1), but nothing in the record tells the Court whether FHWA in fact reached such a conclusion, or on what basis, and the Court may not scour the record to reach conclusions that FHWA itself may or may not have made.

The administrative record also fails to establish that FHWA ensured that the approved design appropriately mitigates any unavoidable harm to historic properties. The Draft and Final EA acknowledged likely harm to Merritt Parkway and other historic structures, but asserted that FHWA could not conduct any further analysis at the time of the publication of those documents (in 1998 and 2000) because final design detailing had not yet been completed. Instead, the Final EA relied on the commitments it undertook in the MOA to evaluate and take steps to mitigate harm on an ongoing basis in the future, in particular, to comply to "the extent feasible" with the Merritt Parkway Guidelines.  Thus, the Final EA states that modifications to the Parkway "*will be evaluated* for consistency with" the Merritt Parkway Guidelines and that the "stipulations outlined in the MOA *will be followed* during implementation of the project, ensuring that the impacts are properly mitigated." Final EA [doc. #7, ex. 1] at  Section 4(f) Evaluation 28-29 (emphasis added); *see also* File 126 at 322 ("Measures to minimize harm . . . will be included in the Memorandum of Agreement MOA to be developed between ConnDOT and the SHPO, which will be included in the Final EA."); File 198 at 1, ¶ 1 ("Modifications to the Merritt Parkway shall be consistent to the extent feasible with ConnDOT's [Merritt Guidelines].").

Contrary to the suggestion in Plaintiffs' briefs, FHWA's decision to rely on the future

commitments the agency made in the Final EA and the MOA is not itself impermissible. Indeed, as

the D.C. Circuit has explained, FHWA regulations "permit a preliminary, first tier 4(f) determination

in circumstances where the unavailability of critical information precludes the completion of the kind

of evaluation section 4(f) requires." *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 373 (D.C.

Cir.1999) (citing 23 C.F.R. § 771.135(o)). But the right to rely on a preliminary analysis entails a

corresponding duty (reflected in the FHWA's own regulations) to revisit the evaluation once the

missing information becomes available. *See id.* ("[W]e do not read section 771.105 as authority for

the agencies to disregard the explicit requirement, in sections 771.135(b) and (l), that they complete

the section 4(f) process *before* the FHWA issues the [Record of Decision].") (emphasis added);

*Monroe County*, 472 F.2d at 700-701 ("The affirmative duty to minimize [harm] is a condition

precedent to approval . . . and *the Secretary must withhold his approval* until he is satisfied that there

has been, in the words of the statute, 'all possible planning to minimize harm.'") (emphasis added).[5]

Yet the administrative record does not reflect that FHWA took any steps to assure itself that

the commitments to future compliance made in the MOA had been accomplished before finally

approving the final design in December 2001.[6]  The centerpiece of the commitment to mitigation,

---

[5] Plaintiffs also argue that FHWA violated its regulations by not producing a supplemental Section 4(f) evaluation once the design details had been finalized. *See* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment [doc. #49] at 19 (citing 23 C.F.R. § 771.135(m), 771.135(o)(2)). The Court need not reach this question of FHWA's interpretation of its own regulations because, at a bare minimum, where the FHWA intends to rely on future analysis, the record must reflect that such analysis occurred and, as explained below, the record before the Court at this time does not do so.

[6] At oral argument, FHWA agreed that compliance with Section 4(f)(2) would require all mitigation efforts to have been completed by the date of final approval. However, the Court notes that even if compliance could be pushed out further, there is no indication on the record that mitigation commitments had been met even by the time the contract was put out to bid in June 2004.

upon which, for example, DOI conditioned its concurrence in the FHWA's decision to approve the Interchange Project, *see* File 169, was compliance to the extent feasible with the Merritt Parkway Guidelines. But the FHWA conceded at oral argument that the final design for the Interchange Project, including demolition of the Main Avenue Bridge, and elevation of ramps up to 32 feet above the grade of the Merritt, does not fully comply with those Guidelines. Of course, that, in and of itself, is not fatal since the MOA stipulated only compliance "to the extent feasible." However, this Court could find nothing in the administrative record to indicate that, during the year between the issuance of the Final EA in December 2000 and the granting of final approval in December 2001, FHWA conducted any analysis or evaluation to confirm that compliance with the Guidelines was infeasible. The record is similarly bereft of any evidence that FHWA performed such an analysis after issuing its final design approval but before the Project was put out to bid in June 2004.

At oral argument, FHWA acknowledged that it could not point to any document in the administrative record, including the minutes of MPAC meetings, that performed a detailed analysis of the feasibility of complying with the Guidelines: "All we have in the record is the MOA which says that the analysis will be undertaken and sporadic references to complying with the Guidelines . . . but nowhere is there a separate document that talks about a feasibility determination." The only documents bearing on this issue are three very brief reports relating the determination that expanding Main Avenue to six lanes would improve traffic flow and safety, but necessitate removal of the Main Avenue Bridge and deviation from the letter of the Guidelines in constructing a replacement. *See* Defendants' Ex. 5, Files 8, 9, 10. But these reports date from 1995, prior to FHWA's commitment to undertake the feasibility analysis, and were never referenced by FHWA in the Final EA, or at any time prior to the Project being put out to bid. Defendants argue, and the Court agrees, that the Final

EA did not have to include a detailed discussion of all of the impacts and all of the alternatives.  *See One Thousand Friends of Iowa v. Mineta*, 250 F. Supp. 2d 1075, 1085 (S.D. Iowa 2002).  But the Final EA should at least have included discussion of some of the impacts and alternatives.  Yet, it did not.

Moreover, the Final EA promised that harm minimization steps "will be investigated." Final EA [doc. #7, Ex. 1] Section 4(f) Evaluation at 28. Yet the administrative record lacks any indication that such investigation took place at any time following the submission of the Final EA, and this deficit cannot be supplied by the 1993-1995 documents added to the record through Defendants' motion to supplement.[7]  Even ConnDOT's letter to FHWA explaining how it believed that the MOA had been complied with did not state that any feasibility analysis had been conducted. File 288. Moreover, even though compliance to the extent feasible with the Merritt Parkway Guidelines was indisputedly a central part of FHWA's strategy for complying with Section 4(f)(2), counsel for FHWA could not articulate at oral argument why certain of the Merritt Guidelines had not been complied with. As the Court summarized, and counsel for FHWA agreed:

> What we know, I think, from the record is this: . . . the Guidelines were considered at meetings . . . there's a final design and we know that the final design, at least in certain respects, doesn't comply with the Guidelines, but the piece that's missing . . . is the piece that shows that there was an informed decision that [we] cannot comply with this guideline because it's infeasible for these reasons.

Plaintiffs have also argued that the MOA was violated because MPAC was never given an

---

[7] The assessment required by Section 4(f) would not necessarily require the FHWA to reinvent the wheel; the agency presumably could look back at the 1993 and 1995 Purcell work and use that work as a basis for satisfying itself that Section 4(f) requirements had been met.  But at a bare minimum, the record must reflect that FHWA undertook such an effort and reached such a conclusion.  Yet the record provided to this Court shows no such thing.

opportunity to review and approve the final design. Although the Court could find no evidence of such a presentation in the file of documents relating to MPAC meetings, ConnDOT certified to FHWA in its March 24, 2005, letter that this obligation had been fulfilled, *see* File 288, and FHWA has argued that it is entitled to rely on such representations. FHWA may be correct in this regard, but ConnDOT's letter cannot fill the other gaps identified above, because the letter does not certify either that ConnDOT analyzed the feasibility of complying with the Guidelines, or that it investigated harm-minimization steps. *Id.*

As FHWA's own regulations recognize, FHWA had an obligation to circle back and ensure that the promises of future steps to minimize harm made in the Final EA and the MOA had been kept. As the agency's own regulations state: "It shall be the responsibility of the applicant . . . to implement those mitigation measures stated as commitments in the environmental documents prepared pursuant to this regulation. The FHWA will assure that this is accomplished as a part of its program management responsibilities." 23 C.F.R. § 771.109(b). Yet, when asked by the Court where it should look in the record for confirmation that the future steps to mitigate harm promised by the Final EA and MOA were taken prior to final approval of the Interchange Project design in December 2001, counsel for FHWA stated "I didn't find anything. . . . That, to be further candid, is a gap." This troubling gap was not filled by the documents added to the record pursuant to Defendants' motion to supplement, almost all of which dated from 1995 or earlier.[8]  It may be that someone did in fact

---

[8] Having conceded what it candidly termed "serious gaps" in the administrative record, FHWA initially suggested at argument that these voids might be filled by the presumption of regularity afforded agency action. But FHWA's own publications teach that the presumption of regularity cannot take the agency so far. As FHWA's Section 4(f) Policy Paper cautions: "If an inadequate administrative record is prepared, the court will lack the required Section 4(f) elements to review, and therefore, will be unable to defer to [the agency] . . . . While agency decisions are entitled to a presumption of regularity . . . courts will carefully review whether the agency followed

take care of minimizing harm to the Merritt Parkway and conforming designs for the Interchange Project to the Guidelines to the extent feasible. But the record does not demonstrate that FHWA assured itself of this fact prior to giving final design approval, and, as the Second Circuit has stated, "[t]he statutory mandate is not fulfilled by vague generalities or pious and self-serving resolutions or by assuming that someone else will take care of it." *Monroe County*, 472 F.2d at 701. In the absence of evidence in the record that FHWA made sure that the commitments undertaken in the Final EA and MOA had in fact been taken care of, FHWA cannot rely on the MOA to demonstrate that it complied with the substantive mandate of Section 4(f).

In the end, the best that can be said is that the administrative record demonstrates – as FHWA's counsel so commendably and candidly acknowledged at oral argument – "a not-so-good compliance" with Congress's directions in Section 4(f). While FHWA gamely suggested that even "not-so-good compliance" would satisfy its obligations, the Court cannot agree. Unlike the procedural focus of NEPA, Section 4(f) imposes important substantive requirements. *See Davis v. Mineta*, 302 F.3d 1104, 1121 (10th Cir. 2002) (finding record inadequate "in light of § 4(f)'s stringent mandates"); *Save Our Heritage, Inc. v. Federal Aviation Administration*, 269 F.3d 49, 59 (1st Cir. 2001) ("Section 4(f) of the Department of Transportation Act . . . is even more stringent [than NEPA and NHPA] where it applies."); *City of Alexandria*, 198 F.3d at 871 ("[S]ection 4(f), unlike the other statutes at issue in this case, imposes a substantive mandate on the

---

the applicable requirements." Policy Paper at 3. The Policy Paper is correct. Use of the presumption of regularity to create from whole cloth evidence of compliance with Section 4(f) would create an end-run around Congress's substantive command and fly in the face of the Supreme Court's instruction that the "presumption [of regularity] is not to shield [the agency] action from a thorough, probing, in-depth review . . . consider[ing] whether the decision was based on a consideration of the relevant factors." *Overton Park,* 401 U.S. at 415-16 (internal citations omitted).

Administration."). As the Supreme Court explained in *Overton Park*, Section 4(f) embodies the determination of Congress that a "special effort" be made, that "protection of parkland [and historic resources] . . . be given paramount importance . . . [and not] lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative [designs] reached extraordinary magnitudes." *Overton Park,* 401 U.S. at 413-14. Where the administrative record contains no evidence that FHWA, after considering all relevant factors, concluded that the feasibility of less harmful construction options had been evaluated and that the commitment to comply with the Guidelines to the extent feasible had been fulfilled, the Court simply cannot conclude, as it must, that FHWA "acted with [its] thumb on the scale, conscious of the importance of protecting the lands listed in the statute." *Eagle Foundation, Inc. v. Dole,* 813 F.2d 798, 803 (7th Cir. 1987).

Accordingly, the Court concludes that FHWA has not met its Section 4(f)(2) obligation to ensure that all possible planning was done to minimize harm prior to approving the Interchange Project. In reaching that conclusion, the Court wishes to emphasize once again that it expresses no view one way or the other on whether the final design for the Interchange Project in fact minimizes harm to the Merritt Parkway or complies to the extent feasible with the Merritt Parkway Guidelines. The Court holds only that the administrative record before it does not show that FHWA made such a determination or on what basis the FHWA did so. Accordingly, Plaintiffs are entitled to summary judgment on their claims under Section 4(f) and Defendants are not. *See, e.g.*, *Monroe County*, 472 F.2d at 703 (rejecting Secretary's contention that Section 4(f) was satisfied by "evidence in the record indicating that . . . [state] officials have been making some efforts to limit the adverse impact," because the Secretary had not made "actual implementation of these suggestions" "a condition

47

precedent to approval"); *D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C. Cir. 1972) (invalidating a Section 4(f) approval made at a time when "final design of the ramps and interchanges [was] not yet complete," because the Secretary "could not have concluded that the necessary planning had already been done," and "absent a finalized plan . . . it is hard to see how the Department could make a meaningful evaluation of 'harm'").

## V.    Remedy

Because it is not for the Court to substitute its judgment for that of FHWA, or "infring[e] upon the agency's decisions in areas where it has expertise," *National Audubon Society v. Hoffman*, 132 F.3d 7, 19 (2d Cir. 1997), "the appropriate remedy is to remand the case to the agency to correct the deficiencies in the record and in its analysis," *id.* at 18.  *See also SPARC*, 352 F.3d at  562;  *D.C. Federation*, 459 F.2d at 1239. This matter is therefore remanded to FHWA with instructions to address the issues raised by Plaintiffs and to conduct further proceedings consistent with Section 4(f), during which Defendants can also consider Plaintiffs' related claims under NEPA and NHPA.

Plaintiffs have also sought injunctive relief halting further construction of the Interchange Project unless and until FHWA cures the defects in its compliance with Section 4(f)(2). It is important to emphasize that "[i]njunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations." *Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir. 1989). "On the contrary, [an] injunction should issue only where the intervention of a court of equity is essential in order effectually to protect . . .  rights against injuries otherwise irremediable." *Id.* (internal quotation marks omitted). Accordingly, the Court has reflected at length on the equities of the regrettable situation before it – one that pits the public interest in safe and

efficient traffic management and in cost-effective construction against the public interest in preservation of historic and natural resources.  As noted in the introduction to this decision, if the Interchange Project proceeds, irreparable harm to historic and natural resources may occur; if it does not proceed, the taxpayers of Connecticut will foot the bill for increased costs in completing a highway project that is undoubtedly long overdue and  important to the State. In deciding whether to grant an injunction, and if so, of what scope, the Court must "arrive at a nice adjustment and reconciliation between the[se] competing claims." *National Audubon Society v. Department of Navy*, 422 F.3d 174, 200 (4th Cir. 2005) (internal quotation marks omitted). However, the Court notes that the scales on which the relative importance of these harms to the citizenry are to be weighed are not entirely neutral. In passing Section 4(f)(2) into law, Congress placed its thumb on the scales in favor of forcing governmental agencies to make a "special effort," 23 U.S.C. § 138, to protect historical and other special resources like the Merritt Parkway.

The testimony of ConnDOT's Deputy Commissioner for Operations, Mr. Carl Bard, sufficiently establishes that the next phase of construction will cause irreparable harm to protected historic resources, including demolition of the Main Avenue and Glover Avenue Bridges, the loss of the original stonework ("[A]ll the stone is embedded in [the concrete] so to remove it, you have to take a hoe and smash up the stone."), and extensive blasting, earthwork, and felling of mature trees, including clearing "the entire south side . . . from just west of Main Avenue almost to West Rock . . . and the remainder on the west side." Although ConnDOT has developed elaborate plans for re-landscaping, and intends to replace felled trees with substantial plants rather than only seedlings, it is not seriously disputed that the Interchange Project will work a major and likely irreversible change to the landscape of the Merritt Parkway. Thus, if these aspects of the construction

process go forward, "the status quo [will be] destroyed." *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 755 (2d Cir. 1977).

As the Second Circuit has often explained, preservation of the status quo is essential to prevent an "irretrievable commitment of resources that would [make] it virtually certain that [ultimate compliance] . . . would never serve the purpose it was intended to serve - that of insuring that federal projects having a significant effect on [historic resources] might proceed only on the basis of a careful and informed decision-making process." *Id.* at 754; *Steubing v. Brinegar*, 511 F.2d 489, 497 (2d Cir. 1975) (Injunctive relief is necessary because without it "construction might well reach the stage of completion where for economic and other reasons it would be impossible to turn back or alter the project in light of what an EIS revealed."). If preparation of an adequate Section 4(f) evaluation in accordance with the will of Congress is not to be "a hollow exercise," *Chelsea Neighbor Ass'n. v. U.S. Postal Service*, 389 F. Supp. 1171, 1186 (S.D.N.Y. 1975), construction should not proceed until FHWA has had an opportunity to assess whether the current design of the Interchange Project embodies all possible planning to minimize harm to the Merritt Parkway and that the Merritt Parkway Guidelines have been complied with to the extent feasible.

Therefore, unless the parties agree among themselves to continue the voluntary moratorium that they have operated under for the past six months – and the Court urges the parties to do so – some form of injunctive relief would be appropriate in this case. The injunction, however, "should be tailored to restrain no more than what is reasonably required to accomplish its ends." *National Audubon Society*, 422 F.3d at 201. The Court realizes that there may well be categories of construction work that could and should go forward without inevitably locking FHWA and ConnDOT into the current design for the Interchange Project or causing irreparable harm to the

Merritt Parkway. In view of the voluntary moratorium to which ConnDOT has thus far submitted itself (and which it has not informed the Court that it intends immediately to terminate), the Court is willing to defer entry of an order on injunctive relief pending input from the parties as to the appropriate scope of such relief. Accordingly, the Court will order the parties jointly to report to the Court on whether the voluntary moratorium will be continued, and if not, to develop and submit to the Court a narrowly tailored form of injunctive relief that permits such work on the Interchange Project as can be undertaken without causing irreparable harm to the Merritt Parkway.

The Court is acutely aware that the longer any injunction or work stoppage is in place, the greater the burden on the citizens of Connecticut. The Court reminds Defendants that the duration of this unhappy situation is very much within their control. Construction may go forward as soon as FHWA cures the defects in its compliance with Section 4(f)(2). The Court cannot tell how long FHWA will require to complete such proceedings, but the Court notes that at least one court has considered a period as short as 45 days sufficient time to prepare an adequate EA. *See Protect Key West, Inc. v. Cheney*, 795 F. Supp. 1552, 1563 (S.D. Fla. 1992). The Court will therefore order FHWA to include with the proposed form of injunctive relief a recommendation as to the appropriate time-frame for completion of the proceedings on remand.

## VI.    Conclusion

In enjoining a Department of Navy project for violating the provisions of NEPA, Judge J. Harvie Wilkinson, III, writing for the Fourth Circuit, recently summed up the approach that this Court has sought to employ in this case under Section 4(f):

> [The Court's] holding in this case rests upon two important separation of powers principles. First, Executive decisionmaking must fully comply with the . . . policy mandate that Congress has expressed through [Section 4(f)] . . . . Second, the

51

> judiciary must take care not to usurp decisionmaking authority that properly belongs to the Executive or unduly hamper the Executive's ability to act within its constitutionally assigned sphere of control.

*National Audubon Society*, 422 F.3d at 207.  The administrative record does not demonstrate that FHWA complied with the first of these principles.  And it would violate the second principle for this Court to substitute its judgment for that of FHWA or for the Court to enter an injunction that is broader than necessary to accomplish the goals that Congress prescribed in Section 4(f). That is why a remand to FHWA is appropriate, so that it can exercise the discretion and judgment that the Constitution and Congress have assigned to the Executive Branch, and why any injunction the Court may be required to enter should be  narrowly and appropriately tailored to accommodate the various interests at stake.

For the foregoing reasons, the Court GRANTS Defendants' Joint Motion to Supplement the Record [doc. #84], and GRANTS IN PART Plaintiffs' Motion for Summary Judgment [doc. #44]. Plaintiffs' motion for summary judgment is granted only as to Count I of Plaintiffs' Amended Complaint brought under Section 4(f)(2). Because the same relief was requested under all counts, the Court DENIES WITHOUT PREJUDICE Plaintiffs' motion for summary judgment with respect to Counts II, III and IV of the Amended Complaint. The Court DENIES Defendants' Cross-Motions for Summary Judgment [docs. ##60, 89], and DENIES AS MOOT Plaintiffs' Motion for a Preliminary Injunction [doc. #6] and Defendants' Motion for Security Costs [doc. # 75].

The Court further ORDERS the parties jointly to report to the Court **by April 10, 2006** on whether they will continue the voluntary moratorium or, if not, what they propose in terms of a narrowly tailored form of injunctive relief that permits such work on the Interchange Project as can be undertaken while the FHWA conducts its proceedings on remand.  FHWA is further ORDERED

52

to conduct such further proceedings as necessary to cure the defects in its Section 4(f)(2) compliance

(and at the same time consider Plaintiffs' concerns under NEPA and NHPA) and to advise the Court

on a suitable deadline for the completion of such proceedings.

IT IS SO ORDERED.

/s/_____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>March 31, 2006</u>**.